# BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT NO. 92 OF POTTAWATOMIE COUNTY ET AL. v. EARLS ET AL.

No. 01–332.   Argued March 19, 2002—Decided June 27, 2002

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, *post*, p. 838. O'CONNOR, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 842. GINSBURG, J., filed a dissent-

ing opinion, in which STEVENS, O'CONNOR, and SOUTER, JJ., joined, *post*, p. 842.

*Linda Maria Meoli* argued the cause for petitioners. With her on the briefs were *Stephanie J. Mather* and *William P. Bleakley.*

*Deputy Solicitor General Clement* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Gregory G. Garre, Leonard Schaitman,* and *Lowell V. Sturgill, Jr.*

*Graham A. Boyd* argued the cause for respondents. With him on the brief was *Steven R. Shapiro.**

JUSTICE THOMAS delivered the opinion of the Court.

The Student Activities Drug Testing Policy implemented by the Board of Education of Independent School District No. 92 of Pottawatomie County (School District) requires all students who participate in competitive extracurricular activities to submit to drug testing. Because this Policy reasonably serves the School District's important interest in detecting and preventing drug use among its students, we hold that it is constitutional.

---

*A brief of *amici curiae* urging reversal was filed for the Washington Legal Foundation et al. by *Richard Willard, Daniel J. Popeo,* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the American Academy of Pediatrics et al. by *David T. Goldberg* and *Daniel N. Abrahamson;* for Jean Burkett et al. by *Craig Goldblatt;* for the Juvenile Law Center et al. by *Marsha L. Levick;* for the National Association of Criminal Defense Lawyers et al. by *John Wesley Hall, Jr., Lisa B. Kemler, Timothy Lynch,* and *Kevin B. Zeese;* and for the Rutherford Institute by *John W. Whitehead, Steven H. Aden,* and *Jamin B. Raskin.*

Briefs of *amici curiae* were filed for the Drug-Free Schools Coalition et al. by *David G. Evans;* for the National School Boards Association et al. by *Julie K. Underwood, Christopher B. Gilbert,* and *Thomas E. Wheeler;* and for Professor Akhil Reed Amar et al. by *Julia M. Carpenter.*

I

The city of Tecumseh, Oklahoma, is a rural community located approximately 40 miles southeast of Oklahoma City. The School District administers all Tecumseh public schools. In the fall of 1998, the School District adopted the Student Activities Drug Testing Policy (Policy), which requires all middle and high school students to consent to drug testing in order to participate in any extracurricular activity. In practice, the Policy has been applied only to competitive extracurricular activities sanctioned by the Oklahoma Secondary Schools Activities Association, such as the Academic Team, Future Farmers of America, Future Homemakers of America, band, choir, pom pon, cheerleading, and athletics. Under the Policy, students are required to take a drug test before participating in an extracurricular activity, must submit to random drug testing while participating in that activity, and must agree to be tested at any time upon reasonable suspicion. The urinalysis tests are designed to detect only the use of illegal drugs, including amphetamines, marijuana, cocaine, opiates, and barbituates, not medical conditions or the presence of authorized prescription medications.

At the time of their suit, both respondents attended Tecumseh High School. Respondent Lindsay Earls was a member of the show choir, the marching band, the Academic Team, and the National Honor Society. Respondent Daniel James sought to participate in the Academic Team.[1] Together with their parents, Earls and James brought a Rev.

---

[1] The District Court noted that the School District's allegations concerning Daniel James called his standing to sue into question because his failing grades made him ineligible to participate in any interscholastic competition. See 115 F. Supp. 2d 1281, 1282, n. 1 (WD Okla. 2000). The court noted, however, that the dispute need not be resolved because Lindsay Earls had standing, and therefore the court was required to address the constitutionality of the drug testing policy. See *ibid.* Because we are likewise satisfied that Earls has standing, we need not address whether James also has standing.

Stat. § 1979, 42 U. S. C. § 1983, action against the School District, challenging the Policy both on its face and as applied to their participation in extracurricular activities.[2]  They alleged that the Policy violates the Fourth Amendment as incorporated by the Fourteenth Amendment and requested injunctive and declarative relief.  They also argued that the School District failed to identify a special need for testing students who participate in extracurricular activities, and that the "Drug Testing Policy neither addresses a proven problem nor promises to bring any benefit to students or the school."  App. 9.

Applying the principles articulated in *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646 (1995), in which we upheld the suspicionless drug testing of school athletes, the United States District Court for the Western District of Oklahoma rejected respondents' claim that the Policy was unconstitutional and granted summary judgment to the School District. The court noted that "special needs" exist in the public school context and that, although the School District did "not show a drug problem of epidemic proportions," there was a history of drug abuse starting in 1970 that presented "legitimate cause for concern."  115 F. Supp. 2d 1281, 1287 (2000). The District Court also held that the Policy was effective because "[i]t can scarcely be disputed that the drug problem among the student body is effectively addressed by making sure that the large number of students participating in competitive, extracurricular activities do not use drugs."  *Id.,* at 1295.

The United States Court of Appeals for the Tenth Circuit reversed, holding that the Policy violated the Fourth Amendment.  The Court of Appeals agreed with the District Court that the Policy must be evaluated in the "unique environment of the school setting," but reached a different conclu-

---

[2] The respondents did not challenge the Policy either as it applies to athletes or as it provides for drug testing upon reasonable, individualized suspicion.  See App. 28.

sion as to the Policy's constitutionality. 242 F. 3d 1264, 1270 (2001). Before imposing a suspicionless drug testing program, the Court of Appeals concluded that a school "must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that group of students will actually redress its drug problem." *Id.*, at 1278. The Court of Appeals then held that because the School District failed to demonstrate such a problem existed among Tecumseh students participating in competitive extracurricular activities, the Policy was unconstitutional. We granted certiorari, 534 U. S. 1015 (2001), and now reverse.

## II

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches by public school officials, such as the collection of urine samples, implicate Fourth Amendment interests. See *Vernonia, supra,* at 652; cf. *New Jersey* v. *T. L. O.,* 469 U. S. 325, 334 (1985). We must therefore review the School District's Policy for "reasonableness," which is the touchstone of the constitutionality of a governmental search.

In the criminal context, reasonableness usually requires a showing of probable cause. See, *e. g., Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602, 619 (1989). The probable-cause standard, however, "is peculiarly related to criminal investigations" and may be unsuited to determining the reasonableness of administrative searches where the "Government seeks to *prevent* the development of hazardous conditions." *Treasury Employees* v. *Von Raab,* 489 U. S. 656, 667–668 (1989) (internal quotation marks and citations omitted) (collecting cases). The Court has also held that a warrant and finding of probable cause are unnecessary in the public school context because such requirements " 'would unduly interfere with the maintenance of the swift and infor-

mal disciplinary procedures [that are] needed.'" *Vernonia, supra,* at 653 (quoting *T. L. O., supra,* at 340–341).

Given that the School District's Policy is not in any way related to the conduct of criminal investigations, see Part II–B, *infra,* respondents do not contend that the School District requires probable cause before testing students for drug use. Respondents instead argue that drug testing must be based at least on some level of individualized suspicion. See Brief for Respondents 12–14. It is true that we generally determine the reasonableness of a search by balancing the nature of the intrusion on the individual's privacy against the promotion of legitimate governmental interests. See *Delaware* v. *Prouse,* 440 U. S. 648, 654 (1979). But we have long held that "the Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 561 (1976). "[I]n certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Von Raab, supra,* at 668; see also *Skinner, supra,* at 624. Therefore, in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin* v. *Wisconsin,* 483 U. S. 868, 873 (1987) (quoting *T. L. O., supra,* at 351 (Blackmun, J., concurring in judgment)); see also *Vernonia, supra,* at 653; *Skinner, supra,* at 619.

Significantly, this Court has previously held that "special needs" inhere in the public school context. See *Vernonia, supra,* at 653; *T. L. O., supra,* at 339–340. While schoolchildren do not shed their constitutional rights when they enter the schoolhouse, see *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 506 (1969), "Fourth

Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia*, 515 U. S., at 656. In particular, a finding of individualized suspicion may not be necessary when a school conducts drug testing.

In *Vernonia*, this Court held that the suspicionless drug testing of athletes was constitutional. The Court, however, did not simply authorize all school drug testing, but rather conducted a fact-specific balancing of the intrusion on the children's Fourth Amendment rights against the promotion of legitimate governmental interests. See *id.*, at 652–653. Applying the principles of *Vernonia* to the somewhat different facts of this case, we conclude that Tecumseh's Policy is also constitutional.

A

We first consider the nature of the privacy interest allegedly compromised by the drug testing. See *id.*, at 654. As in *Vernonia*, the context of the public school environment serves as the backdrop for the analysis of the privacy interest at stake and the reasonableness of the drug testing policy in general. See *ibid.* ("Central . . . is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster"); see also *id.*, at 665 ("The most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care"); *ibid.* ("[W]hen the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake").

A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety. Schoolchildren are routinely required to submit to physical examinations and vaccinations

against disease. See *id.*, at 656. Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults. See *T. L. O.*, 469 U. S., at 350 (Powell, J., concurring) ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern").

Respondents argue that because children participating in nonathletic extracurricular activities are not subject to regular physicals and communal undress, they have a stronger expectation of privacy than the athletes tested in *Vernonia*. See Brief for Respondents 18–20. This distinction, however, was not essential to our decision in *Vernonia*, which depended primarily upon the school's custodial responsibility and authority.[3]

In any event, students who participate in competitive extracurricular activities voluntarily subject themselves to many of the same intrusions on their privacy as do athletes.[4]

---

[3] JUSTICE GINSBURG argues that *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995), depended on the fact that the drug testing program applied only to student athletes. But even the passage cited by the dissent manifests the supplemental nature of this factor, as the Court in *Vernonia* stated that "[l]egitimate privacy expectations are *even less* with regard to student athletes." See *post*, at 847 (quoting *Vernonia*, 515 U. S., at 657) (emphasis added). In upholding the drug testing program in *Vernonia*, we considered the school context "[c]entral" and "[t]he most significant element." *Id.*, at 654, 665. This hefty weight on the side of the school's balance applies with similar force in this case even though we undertake a separate balancing with regard to this particular program.

[4] JUSTICE GINSBURG's observations with regard to extracurricular activities apply with equal force to athletics. See *post*, at 845 ("Participation in such [extracurricular] activities is a key component of school life, essential in reality for students applying to college, and, for all participants, a significant contributor to the breadth and quality of the educational experience").

Some of these clubs and activities require occasional off-campus travel and communal undress. All of them have their own rules and requirements for participating students that do not apply to the student body as a whole. 115 F. Supp. 2d, at 1289–1290. For example, each of the competitive extracurricular activities governed by the Policy must abide by the rules of the Oklahoma Secondary Schools Activities Association, and a faculty sponsor monitors the students for compliance with the various rules dictated by the clubs and activities. See *id.*, at 1290. This regulation of extracurricular activities further diminishes the expectation of privacy among schoolchildren. Cf. *Vernonia, supra,* at 657 ("Somewhat like adults who choose to participate in a closely regulated industry, students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy" (internal quotation marks omitted)). We therefore conclude that the students affected by this Policy have a limited expectation of privacy.

B

Next, we consider the character of the intrusion imposed by the Policy. See *Vernonia, supra,* at 658. Urination is "an excretory function traditionally shielded by great privacy." *Skinner,* 489 U. S., at 626. But the "degree of intrusion" on one's privacy caused by collecting a urine sample "depends upon the manner in which production of the urine sample is monitored." *Vernonia, supra,* at 658.

Under the Policy, a faculty monitor waits outside the closed restroom stall for the student to produce a sample and must "listen for the normal sounds of urination in order to guard against tampered specimens and to insure an accurate chain of custody." App. 199. The monitor then pours the sample into two bottles that are sealed and placed into a mailing pouch along with a consent form signed by the student. This procedure is virtually identical to that reviewed in *Vernonia,* except that it additionally protects privacy by

allowing male students to produce their samples behind a closed stall. Given that we considered the method of collection in *Vernonia* a "negligible" intrusion, 515 U. S., at 658, the method here is even less problematic.

In addition, the Policy clearly requires that the test results be kept in confidential files separate from a student's other educational records and released to school personnel only on a "need to know" basis. Respondents nonetheless contend that the intrusion on students' privacy is significant because the Policy fails to protect effectively against the disclosure of confidential information and, specifically, that the school "has been careless in protecting that information: for example, the Choir teacher looked at students' prescription drug lists and left them where other students could see them." Brief for Respondents 24. But the choir teacher is someone with a "need to know," because during off-campus trips she needs to know what medications are taken by her students. Even before the Policy was enacted the choir teacher had access to this information. See App. 132. In any event, there is no allegation that any other student did see such information. This one example of alleged carelessness hardly increases the character of the intrusion.

Moreover, the test results are not turned over to any law enforcement authority. Nor do the test results here lead to the imposition of discipline or have any academic consequences. Cf. *Vernonia, supra,* at 658, and n. 2. Rather, the only consequence of a failed drug test is to limit the student's privilege of participating in extracurricular activities. Indeed, a student may test positive for drugs twice and still be allowed to participate in extracurricular activities. After the first positive test, the school contacts the student's parent or guardian for a meeting. The student may continue to participate in the activity if within five days of the meeting the student shows proof of receiving drug counseling and submits to a second drug test in two weeks. For the second positive test, the student is suspended from participation in

all extracurricular activities for 14 days, must complete four hours of substance abuse counseling, and must submit to monthly drug tests. Only after a third positive test will the student be suspended from participating in any extracurricular activity for the remainder of the school year, or 88 school days, whichever is longer. See App. 201–202.

Given the minimally intrusive nature of the sample collection and the limited uses to which the test results are put, we conclude that the invasion of students' privacy is not significant.

## C

Finally, this Court must consider the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them. See *Vernonia*, 515 U. S., at 660. This Court has already articulated in detail the importance of the governmental concern in preventing drug use by schoolchildren. See *id.*, at 661–662. The drug abuse problem among our Nation's youth has hardly abated since *Vernonia* was decided in 1995. In fact, evidence suggests that it has only grown worse.[5] As in *Vernonia*, "the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction." *Id.*, at 662. The health and safety risks identified in *Vernonia* apply with equal force to Tecumseh's children. Indeed, the nationwide drug epidemic makes the war against drugs a pressing concern in every school.

Additionally, the School District in this case has presented specific evidence of drug use at Tecumseh schools. Teachers testified that they had seen students who appeared to be

---

[5] For instance, the number of 12th graders using any illicit drug increased from 48.4 percent in 1995 to 53.9 percent in 2001. The number of 12th graders reporting they had used marijuana jumped from 41.7 percent to 49.0 percent during that same period. See Department of Health and Human Services, Monitoring the Future: National Results on Adolescent Drug Use, Overview of Key Findings (2001) (Table 1).

under the influence of drugs and that they had heard students speaking openly about using drugs. See, *e. g.*, App. 72 (deposition of Dean Rogers); *id.*, at 115 (deposition of Sheila Evans). A drug dog found marijuana cigarettes near the school parking lot. Police officers once found drugs or drug paraphernalia in a car driven by a Future Farmers of America member. And the school board president reported that people in the community were calling the board to discuss the "drug situation." See 115 F. Supp. 2d, at 1285–1286. We decline to second-guess the finding of the District Court that "[v]iewing the evidence as a whole, it cannot be reasonably disputed that the [School District] was faced with a 'drug problem' when it adopted the Policy." *Id.*, at 1287.

Respondents consider the proffered evidence insufficient and argue that there is no "real and immediate interest" to justify a policy of drug testing nonathletes. Brief for Respondents 32. We have recognized, however, that "[a] demonstrated problem of drug abuse . . . [is] not in all cases necessary to the validity of a testing regime," but that some showing does "shore up an assertion of special need for a suspicionless general search program." *Chandler* v. *Miller*, 520 U. S. 305, 319 (1997). The School District has provided sufficient evidence to shore up the need for its drug testing program.

Furthermore, this Court has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing. For instance, in *Von Raab* the Court upheld the drug testing of customs officials on a purely preventive basis, without any documented history of drug use by such officials. See 489 U. S., at 673. In response to the lack of evidence relating to drug use, the Court noted generally that "drug abuse is one of the most serious problems confronting our society today," and that programs to prevent and detect drug use among customs officials could not be deemed unreasonable. *Id.*, at 674; cf. *Skinner*, 489 U. S., at 607, and n. 1 (noting nationwide

studies that identified on-the-job alcohol and drug use by railroad employees). Likewise, the need to prevent and deter the substantial harm of childhood drug use provides the necessary immediacy for a school testing policy. Indeed, it would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use.

Given the nationwide epidemic of drug use, and the evidence of increased drug use in Tecumseh schools, it was entirely reasonable for the School District to enact this particular drug testing policy. We reject the Court of Appeals' novel test that "any district seeking to impose a random suspicionless drug testing policy as a condition to participation in a school activity must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that group of students will actually redress its drug problem." 242 F. 3d, at 1278. Among other problems, it would be difficult to administer such a test. As we cannot articulate a threshold level of drug use that would suffice to justify a drug testing program for schoolchildren, we refuse to fashion what would in effect be a constitutional quantum of drug use necessary to show a "drug problem."

Respondents also argue that the testing of nonathletes does not implicate any safety concerns, and that safety is a "crucial factor" in applying the special needs framework. Brief for Respondents 25–27. They contend that there must be "surpassing safety interests," *Skinner, supra,* at 634, or "extraordinary safety and national security hazards," *Von Raab, supra,* at 674, in order to override the usual protections of the Fourth Amendment. See Brief for Respondents 25–26. Respondents are correct that safety factors into the special needs analysis, but the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike. We know all too well that drug

use carries a variety of health risks for children, including death from overdose.

We also reject respondents' argument that drug testing must presumptively be based upon an individualized reasonable suspicion of wrongdoing because such a testing regime would be less intrusive. See *id.*, at 12–16. In this context, the Fourth Amendment does not require a finding of individualized suspicion, see *supra*, at 829, and we decline to impose such a requirement on schools attempting to prevent and detect drug use by students. Moreover, we question whether testing based on individualized suspicion in fact would be less intrusive. Such a regime would place an additional burden on public school teachers who are already tasked with the difficult job of maintaining order and discipline. A program of individualized suspicion might unfairly target members of unpopular groups. The fear of lawsuits resulting from such targeted searches may chill enforcement of the program, rendering it ineffective in combating drug use. See *Vernonia*, 515 U. S., at 663–664 (offering similar reasons for why "testing based on 'suspicion' of drug use would not be better, but worse"). In any case, this Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." *Martinez-Fuerte*, 428 U. S., at 556–557, n. 12; see also *Skinner, supra*, at 624 ("[A] showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable").

Finally, we find that testing students who participate in extracurricular activities is a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use. While in *Vernonia* there might have been a closer fit between the testing of athletes and the trial court's finding that the drug problem

was "fueled by the 'role model' effect of athletes' drug use," such a finding was not essential to the holding. 515 U. S., at 663; cf. *id.*, at 684–685 (O'CONNOR, J., dissenting) (questioning the extent of the drug problem, especially as applied to athletes). *Vernonia* did not require the school to test the group of students most likely to use drugs, but rather considered the constitutionality of the program in the context of the public school's custodial responsibilities. Evaluating the Policy in this context, we conclude that the drug testing of Tecumseh students who participate in extracurricular activities effectively serves the School District's interest in protecting the safety and health of its students.

## III

Within the limits of the Fourth Amendment, local school boards must assess the desirability of drug testing schoolchildren. In upholding the constitutionality of the Policy, we express no opinion as to its wisdom. Rather, we hold only that Tecumseh's Policy is a reasonable means of furthering the School District's important interest in preventing and deterring drug use among its schoolchildren. Accordingly, we reverse the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BREYER, concurring.

I agree with the Court that *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646 (1995), governs this case and requires reversal of the Tenth Circuit's decision. The school's drug testing program addresses a serious national problem by focusing upon demand, avoiding the use of criminal or disciplinary sanctions, and relying upon professional counseling and treatment. See App. 201–202. In my view, this program does not violate the Fourth Amendment's prohibition of "unreasonable searches and seizures." I reach this conclusion primarily for the reasons given by the Court, but I would

emphasize several underlying considerations, which I understand to be consistent with the Court's opinion.

I

In respect to the school's need for the drug testing program, I would emphasize the following: First, the drug problem in our Nation's schools is serious in terms of size, the kinds of drugs being used, and the consequences of that use both for our children and the rest of us. See, *e. g.,* White House Nat. Drug Control Strategy 25 (Feb. 2002) (drug abuse leads annually to about 20,000 deaths, $160 billion in economic costs); Department of Health and Human Services, L. Johnston et al., Monitoring the Future: National Results on Adolescent Drug Use, Overview of Key Findings 5 (2001) (Monitoring the Future) (more than one-third of all students have used illegal drugs before completing the eighth grade; more than half before completing high school); *ibid.* (about 30% of all students use drugs *other than marijuana* prior to completing high school (emphasis added)); National Center on Addiction and Substance Abuse, Malignant Neglect: Substance Abuse and America's Schools 15 (Sept. 2001) (Malignant Neglect) (early use leads to later drug dependence); Nat. Drug Control Strategy, *supra,* at 1 (same).

Second, the government's emphasis upon supply side interdiction apparently has not reduced teenage use in recent years. Compare R. Perl, CRS Issue Brief for Congress, Drug Control: International Policy and Options CRS–1 (Dec. 12, 2001) (supply side programs account for 66% of the federal drug control budget), with Partnership for a Drug-Free America, 2001 Partnership Attitude Tracking Study: Key Findings 1 (showing increase in teenage drug use in early 1990's, peak in 1997, holding steady thereafter); 2000–2001 PRIDE National Summary: Alcohol, Tobacco, Illicit Drugs, Violence and Related Behaviors, Grades 6 thru 12 (Jul. 16, 2002), http://www.pridesurveys.com/main/supportfiles/natsum00.pdf, p. 15 (slight rise in high school drug use in

2000–2001); Monitoring the Future, Table 1 (lifetime prevalence of drug use increasing over last 10 years).

Third, public school systems must find effective ways to deal with this problem. Today's public expects its schools not simply to teach the fundamentals, but "to shoulder the burden of feeding students breakfast and lunch, offering before and after school child care services, and providing medical and psychological services," all in a school environment that is safe and encourages learning. Brief for National School Boards Association et al. as *Amici Curiae* 3–4. See also *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 681 (1986) (Schools " 'prepare pupils for citizenship in the Republic [and] inculcate the habits and manners of civility as values in themselves conductive to happiness and as indispensable to the practice of self-government in the community and the nation' ") (quoting C. Beard & M. Beard, New Basic History of the United States 228 (1968)). The law itself recognizes these responsibilities with the phrase *in loco parentis*—a phrase that draws its legal force primarily from the needs of younger students (who here are necessarily grouped together with older high school students) and which reflects, not that a child or adolescent lacks an interest in privacy, but that a child's or adolescent's school-related privacy interest, when compared to the privacy interests of an adult, has different dimensions. Cf. *Vernonia, supra,* at 654–655. A public school system that fails adequately to carry out its responsibilities may well see parents send their children to private or parochial school instead—with help from the State. See *Zelman* v. *Simmons-Harris, ante,* p. 639.

Fourth, the program at issue here seeks to discourage demand for drugs by changing the school's environment in order to combat the single most important factor leading schoolchildren to take drugs, namely, peer pressure. Malignant Neglect 4 (students "whose friends use illicit drugs are more than 10 times likelier to use illicit drugs than those whose friends do not"). It offers the adolescent a nonthreat-

ening reason to decline his friend's drug-use invitations, namely, that he intends to play baseball, participate in debate, join the band, or engage in any one of half a dozen useful, interesting, and important activities.

## II

In respect to the privacy-related burden that the drug testing program imposes upon students, I would emphasize the following: First, not everyone would agree with this Court's characterization of the privacy-related significance of urine sampling as "'negligible.'" *Ante,* at 833 (quoting *Vernonia,* 515 U. S., at 658). Some find the procedure no more intrusive than a routine medical examination, but others are seriously embarrassed by the need to provide a urine sample with someone listening "outside the closed restroom stall," *ante,* at 832. When trying to resolve this kind of close question involving the interpretation of constitutional values, I believe it important that the school board provided an opportunity for the airing of these differences at public meetings designed to give the entire community "the opportunity to be able to participate" in developing the drug policy. App. 87. The board used this democratic, participatory process to uncover and to resolve differences, giving weight to the fact that the process, in this instance, revealed little, if any, objection to the proposed testing program.

Second, the testing program avoids subjecting the entire school to testing. And it preserves an option for a conscientious objector. He can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion from the school.

Third, a contrary reading of the Constitution, as requiring "individualized suspicion" in this public school context, could well lead schools to push the boundaries of "individualized suspicion" to its outer limits, using subjective criteria that may "unfairly target members of unpopular groups," *ante,* at 837, or leave those whose behavior is slightly abnormal

stigmatized in the minds of others. See Belsky, Random vs. Suspicion-Based Drug Testing in the Public Schools—A Surprising Civil Liberties Dilemma, 27 Okla. City U. L. Rev. 1, 20–21 (forthcoming 2002) (listing court-approved factors justifying suspicion-based drug testing, including tiredness, overactivity, quietness, boisterousness, sloppiness, excessive meticulousness, and tardiness). If so, direct application of the Fourth Amendment's prohibition against "unreasonable searches and seizures" will further that Amendment's liberty-protecting objectives at least to the same extent as application of the mediating "individualized suspicion" test, where, as here, the testing program is neither criminal nor disciplinary in nature.

\* \* \*

I cannot know whether the school's drug testing program will work. But, in my view, the Constitution does not prohibit the effort. Emphasizing the considerations I have mentioned, along with others to which the Court refers, I conclude that the school's drug testing program, constitutionally speaking, is not "unreasonable." And I join the Court's opinion.

JUSTICE O'CONNOR, with whom JUSTICE SOUTER joins, dissenting.

I dissented in *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995), and continue to believe that case was wrongly decided. Because *Vernonia* is now this Court's precedent, and because I agree that petitioners' program fails even under the balancing approach adopted in that case, I join JUSTICE GINSBURG's dissent.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE O'CONNOR, and JUSTICE SOUTER join, dissenting.

Seven years ago, in *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995), this Court determined that a school

district's policy of randomly testing the urine of its student athletes for illicit drugs did not violate the Fourth Amendment. In so ruling, the Court emphasized that drug use "increase[d] the risk of sports-related injury" and that Vernonia's athletes were the "leaders" of an aggressive local "drug culture" that had reached "'epidemic proportions.'" *Id.*, at 649. Today, the Court relies upon *Vernonia* to permit a school district with a drug problem its superintendent repeatedly described as "not . . . major," see App. 180, 186, 191, to test the urine of an academic team member solely by reason of her participation in a nonathletic, competitive extracurricular activity—participation associated with neither special dangers from, nor particular predilections for, drug use.

"[T]he legality of a search of a student," this Court has instructed, "should depend simply on the reasonableness, under all the circumstances, of the search." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 341 (1985). Although "'special needs' inhere in the public school context," see *ante*, at 829 (quoting *Vernonia*, 515 U. S., at 653), those needs are not so expansive or malleable as to render reasonable any program of student drug testing a school district elects to install. The particular testing program upheld today is not reasonable; it is capricious, even perverse: Petitioners' policy targets for testing a student population least likely to be at risk from illicit drugs and their damaging effects. I therefore dissent.

I

A

A search unsupported by probable cause nevertheless may be consistent with the Fourth Amendment "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987) (internal quotation marks omitted). In *Vernonia*, this Court made clear that "such 'special needs' . . . exist in the public school con-

text." 515 U. S., at 653 (quoting *Griffin*, 483 U. S., at 873). The Court observed:

> "[W]hile children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506 (1969), the nature of those rights is what is appropriate for children in school. . . . Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." 515 U. S., at 655–656 (other citations omitted).

The *Vernonia* Court concluded that a public school district facing a disruptive and explosive drug abuse problem sparked by members of its athletic teams had "special needs" that justified suspicionless testing of district athletes as a condition of their athletic participation.

This case presents circumstances dispositively different from those of *Vernonia*. True, as the Court stresses, Tecumseh students participating in competitive extracurricular activities other than athletics share two relevant characteristics with the athletes of *Vernonia*. First, both groups attend public schools. "[O]ur decision in *Vernonia*," the Court states, "depended primarily upon the school's custodial responsibility and authority." *Ante*, at 831; see also *ante*, at 840 (BREYER, J., concurring) (school districts act *in loco parentis*). Concern for student health and safety is basic to the school's caretaking, and it is undeniable that "drug use carries a variety of health risks for children, including death from overdose." *Ante*, at 836–837 (majority opinion).

Those risks, however, are present for *all* schoolchildren. *Vernonia* cannot be read to endorse invasive and suspicionless drug testing of all students upon any evidence of drug use, solely because drugs jeopardize the life and health of those who use them. Many children, like many adults, en-

gage in dangerous activities on their own time; that the children are enrolled in school scarcely allows government to monitor all such activities. If a student has a reasonable subjective expectation of privacy in the personal items she brings to school, see *T. L. O.*, 469 U. S., at 338–339, surely she has a similar expectation regarding the chemical composition of her urine. Had the *Vernonia* Court agreed that public school attendance, in and of itself, permitted the State to test each student's blood or urine for drugs, the opinion in *Vernonia* could have saved many words. See, *e. g.*, 515 U. S., at 662 ("[I]t must not be lost sight of that [the Vernonia School District] program is directed . . . to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high.").

The second commonality to which the Court points is the voluntary character of both interscholastic athletics and other competitive extracurricular activities. "By choosing to 'go out for the team,' [school athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id.*, at 657. Comparably, the Court today observes, "students who participate in competitive extracurricular activities voluntarily subject themselves to" additional rules not applicable to other students. *Ante*, at 831.

The comparison is enlightening. While extracurricular activities are "voluntary" in the sense that they are not required for graduation, they are part of the school's educational program; for that reason, the petitioner (hereinafter School District) is justified in expending public resources to make them available. Participation in such activities is a key component of school life, essential in reality for students applying to college, and, for all participants, a significant contributor to the breadth and quality of the educational experience. See Brief for Respondents 6; Brief for American Academy of Pediatrics et al. as *Amici Curiae* 8–9. Students

"volunteer" for extracurricular pursuits in the same way they might volunteer for honors classes: They subject themselves to additional requirements, but they do so in order to take full advantage of the education offered them. Cf. *Lee* v. *Weisman*, 505 U. S. 577, 595 (1992) ("Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term 'voluntary,' for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years.").

Voluntary participation in athletics has a distinctly different dimension: Schools regulate student athletes discretely because competitive school sports by their nature require communal undress and, more important, expose students to physical risks that schools have a duty to mitigate. For the very reason that schools cannot offer a program of competitive athletics without intimately affecting the privacy of students, *Vernonia* reasonably analogized school athletes to "adults who choose to participate in a closely regulated industry." 515 U. S., at 657 (internal quotation marks omitted). Industries fall within the closely regulated category when the nature of their activities requires substantial government oversight. See, *e. g., United States* v. *Biswell*, 406 U. S. 311, 315–316 (1972). Interscholastic athletics similarly require close safety and health regulation; a school's choir, band, and academic team do not.

In short, *Vernonia* applied, it did not repudiate, the principle that "the legality of a search of a student should depend simply on the reasonableness, *under all the circumstances,* of the search." *T. L. O.,* 469 U. S., at 341 (emphasis added). Enrollment in a public school, and election to participate in school activities beyond the bare minimum that the curriculum requires, are indeed factors relevant to reasonableness, but they do not on their own justify intrusive, suspicionless searches. *Vernonia,* accordingly, did not rest upon these

factors; instead, the Court performed what today's majority aptly describes as a "fact-specific balancing," *ante*, at 830. Balancing of that order, applied to the facts now before the Court, should yield a result other than the one the Court announces today.

B

*Vernonia* initially considered "the nature of the privacy interest upon which the search [there] at issue intrude[d]." 515 U. S., at 654. The Court emphasized that student athletes' expectations of privacy are necessarily attenuated:

> "Legitimate privacy expectations are even less with regard to student athletes. School sports are not for the bashful. They require 'suiting up' before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford. The locker rooms in Vernonia are typical: No individual dressing rooms are provided; shower heads are lined up along a wall, unseparated by any sort of partition or curtain; not even all the toilet stalls have doors. . . . [T]here is an element of communal undress inherent in athletic participation." *Id.*, at 657 (internal quotation marks omitted).

Competitive extracurricular activities other than athletics, however, serve students of all manner: the modest and shy along with the bold and uninhibited. Activities of the kind plaintiff-respondent Lindsay Earls pursued—choir, show choir, marching band, and academic team—afford opportunities to gain self-assurance, to "come to know faculty members in a less formal setting than the typical classroom," and to acquire "positive social supports and networks [that] play a critical role in periods of heightened stress." Brief for American Academy of Pediatrics et al. as *Amici Curiae* 13.

On "occasional out-of-town trips," students like Lindsay Earls "must sleep together in communal settings and use

communal bathrooms." 242 F. 3d 1264, 1275 (CA10 2001). But those situations are hardly equivalent to the routine communal undress associated with athletics; the School District itself admits that when such trips occur, "public-like restroom facilities," which presumably include enclosed stalls, are ordinarily available for changing, and that "more modest students" find other ways to maintain their privacy. Brief for Petitioners 34.[1]

After describing school athletes' reduced expectation of privacy, the *Vernonia* Court turned to "the character of the intrusion . . . complained of." 515 U. S., at 658. Observing that students produce urine samples in a bathroom stall with a coach or teacher outside, *Vernonia* typed the privacy interests compromised by the process of obtaining samples "negligible." *Ibid.* As to the required pretest disclosure of prescription medications taken, the Court assumed that "the School District would have permitted [a student] to provide the requested information in a confidential manner—for example, in a sealed envelope delivered to the testing lab." *Id.,* at 660. On that assumption, the Court concluded that Vernonia's athletes faced no significant invasion of privacy.

In this case, however, Lindsay Earls and her parents allege that the School District handled personal information collected under the policy carelessly, with little regard for its confidentiality. Information about students' prescription drug use, they assert, was routinely viewed by Lindsay's choir teacher, who left files containing the information unlocked and unsealed, where others, including students, could see them; and test results were given out to all activity sponsors whether or not they had a clear "need to know." See

---

[1] According to Tecumseh's choir teacher, choir participants who chose not to wear their choir uniforms to school on the days of competitions could change either in "a rest room in a building" or on the bus, where "[m]any of them have figured out how to [change] without having [anyone] . . . see anything." 2 Appellants' App. in No. 00–6128 (CA10), p. 296.

Brief for Respondents 6, 24; App. 105–106, 131. But see *id.*, at 199 (policy requires that "[t]he medication list shall be submitted to the lab in a sealed and confidential envelope and shall not be viewed by district employees").

In granting summary judgment to the School District, the District Court observed that the District's "[p]olicy expressly provides for confidentiality of test results, and the Court must assume that the confidentiality provisions will be honored." 115 F. Supp. 2d 1281, 1293 (WD Okla. 2000). The assumption is unwarranted. Unlike *Vernonia,* where the District Court held a bench trial before ruling in the School District's favor, this case was decided by the District Court on summary judgment. At that stage, doubtful matters should not have been resolved in favor of the judgment seeker. See *United States* v. *Diebold, Inc.,* 369 U. S. 654, 655 (1962) *(per curiam)* ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion."); see also 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2716, pp. 274–277 (3d ed. 1998).

Finally, the "nature and immediacy of the governmental concern," *Vernonia,* 515 U. S., at 660, faced by the Vernonia School District dwarfed that confronting Tecumseh administrators. Vernonia initiated its drug testing policy in response to an alarming situation: "[A] large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion . . . fueled by alcohol and drug abuse as well as the student[s'] misperceptions about the drug culture." *Id.,* at 649 (internal quotation marks omitted). Tecumseh, by contrast, repeatedly reported to the Federal Government during the period leading up to the adoption of the policy that "types of drugs [other than alcohol and tobacco] including controlled dangerous substances, are present [in the schools] but have not identified themselves as major problems at this time." 1998–1999 Tecum-

seh School's Application for Funds under the Safe and Drug-Free Schools and Communities Program, reprinted at App. 191; accord, 1996–1997 Application, reprinted at App. 186; 1995–1996 Application, reprinted at App. 180.[2] As the Tenth Circuit observed, "without a demonstrated drug abuse problem among the group being tested, the efficacy of the District's solution to its perceived problem is . . . greatly diminished." 242 F. 3d, at 1277.

The School District cites *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 673–674 (1989), in which this Court permitted random drug testing of customs agents absent "any perceived drug problem among Customs employees," given that "drug abuse is one of the most serious problems confronting our society today." See also *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 607, and n. 1 (1989) (upholding random drug and alcohol testing of railway employees based upon industry-wide, rather than railway-specific, evidence of drug and alcohol problems). The tests in *Von Raab* and *Railway Labor Executives*, however, were installed to avoid enormous risks to the lives and limbs of others, not dominantly in response to the health risks to users invariably present in any case of drug use. See *Von Raab*, 489 U. S., at 674 (drug use by customs agents involved in drug interdiction creates "extraordinary safety and national security hazards"); *Railway Labor Executives*, 489 U. S., at 628 (railway operators "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences"); see

---

[2] The Court finds it sufficient that there be evidence of *some* drug use in Tecumseh's schools: "As we cannot articulate a threshold level of drug use that would suffice to justify a drug testing program for schoolchildren, we refuse to fashion what would in effect be a constitutional quantum of drug use necessary to show a 'drug problem.'" *Ante*, at 836. One need not establish a bright-line "constitutional quantum of drug use" to recognize the relevance of the superintendent's reports characterizing drug use among Tecumseh's students as "not . . . [a] major proble[m]," App. 180, 186, 191.

also *Chandler* v. *Miller*, 520 U. S. 305, 321 (1997) (*"Von Raab* must be read in its unique context").

Not only did the Vernonia and Tecumseh districts confront drug problems of distinctly different magnitudes, they also chose different solutions: Vernonia limited its policy to athletes; Tecumseh indiscriminately subjected to testing all participants in competitive extracurricular activities. Urging that "the safety interest furthered by drug testing is undoubtedly substantial for all children, athletes and nonathletes alike," *ante,* at 836, the Court cuts out an element essential to the *Vernonia* judgment. Citing medical literature on the effects of combining illicit drug use with physical exertion, the *Vernonia* Court emphasized that "the particular drugs screened by [Vernonia's] Policy have been demonstrated to pose substantial physical risks to athletes." 515 U. S., at 662; see also *id.,* at 666 (GINSBURG, J., concurring) (*Vernonia* limited to "those seeking to engage with others in team sports"). We have since confirmed that these special risks were necessary to our decision in *Vernonia.* See *Chandler,* 520 U. S., at 317 (*Vernonia* "emphasized the importance of deterring drug use by schoolchildren and the risk of injury a drug-using student athlete cast on himself and those engaged with him on the playing field"); see also *Ferguson* v. *Charleston,* 532 U. S. 67, 87 (2001) (KENNEDY, J., concurring) (Vernonia's policy had goal of " '[d]eterring drug use by our Nation's schoolchildren,' and particularly by student-athletes, because 'the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high' ") (quoting *Vernonia,* 515 U. S., at 661–662).

At the margins, of course, no policy of *random* drug testing is perfectly tailored to the harms it seeks to address. The School District cites the dangers faced by members of the band, who must "perform extremely precise routines with heavy equipment and instruments in close proximity to other students," and by Future Farmers of America, who

"are required to individually control and restrain animals as large as 1500 pounds." Brief for Petitioners 43. For its part, the United States acknowledges that "the linebacker faces a greater risk of serious injury if he takes the field under the influence of drugs than the drummer in the half-time band," but parries that "the risk of injury to a student who is under the influence of drugs while playing golf, cross country, or volleyball (sports covered by the policy in *Vernonia*) is scarcely any greater than the risk of injury to a student . . . handling a 1500-pound steer (as [Future Farmers of America] members do) or working with cutlery or other sharp instruments (as [Future Homemakers of America] members do)." Brief for United States as *Amicus Curiae* 18. One can demur to the Government's view of the risks drug use poses to golfers, cf. *PGA TOUR, Inc.* v. *Martin*, 532 U. S. 661, 687 (2001) ("golf is a low intensity activity"), for golfers were surely as marginal among the linebackers, sprinters, and basketball players targeted for testing in Vernonia as steer-handlers are among the choristers, musicians, and academic-team members subject to urinalysis in Tecumseh.[3] Notwithstanding nightmarish images of out-of-control flatware, livestock run amok, and colliding tubas disturbing the peace and quiet of Tecumseh, the great majority of students the School District seeks to test in truth are engaged in activities that are not safety sensitive to an unusual degree. There is a difference between imperfect tailoring and no tailoring at all.

The Vernonia district, in sum, had two good reasons for testing athletes: Sports team members faced special health risks and they "were the leaders of the drug culture." *Vernonia*, 515 U. S., at 649. No similar reason, and no other tenable justification, explains Tecumseh's decision to target

---

[3] Cross-country runners and volleyball players, by contrast, engage in substantial physical exertion. See *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 663 (1995) (describing special dangers of combining drug use with athletics generally).

for testing all participants in every competitive extracurricular activity. See *Chandler*, 520 U. S., at 319 (drug testing candidates for office held incompatible with Fourth Amendment because program was "not well designed to identify candidates who violate antidrug laws").

Nationwide, students who participate in extracurricular activities are significantly less likely to develop substance abuse problems than are their less-involved peers. See, *e. g.*, N. Zill, C. Nord, & L. Loomis, Adolescent Time Use, Risky Behavior, and Outcomes 52 (1995) (tenth graders "who reported spending no time in school-sponsored activities were . . . 49 percent more likely to have used drugs" than those who spent 1–4 hours per week in such activities). Even if students might be deterred from drug use in order to preserve their extracurricular eligibility, it is at least as likely that other students might forgo their extracurricular involvement in order to avoid detection of their drug use. Tecumseh's policy thus falls short doubly if deterrence is its aim: It invades the privacy of students who need deterrence least, and risks steering students at greatest risk for substance abuse away from extracurricular involvement that potentially may palliate drug problems.[4]

To summarize, this case resembles *Vernonia* only in that the School Districts in both cases conditioned engagement in activities outside the obligatory curriculum on random subjection to urinalysis. The defining characteristics of the two programs, however, are entirely dissimilar. The Vernonia district sought to test a subpopulation of students distinguished by their reduced expectation of privacy, their special

---

[4] The Court notes that programs of individualized suspicion, unlike those using random testing, "might unfairly target members of unpopular groups." *Ante*, at 837; see also *ante*, at 841–842 (BREYER, J., concurring). Assuming, *arguendo*, that this is so, the School District here has not exchanged individualized suspicion for random testing. It has installed random testing in addition to, rather than in lieu of, testing "at any time when there is reasonable suspicion." App. 197.

susceptibility to drug-related injury, and their heavy involvement with drug use. The Tecumseh district seeks to test a much larger population associated with none of these factors. It does so, moreover, without carefully safeguarding student confidentiality and without regard to the program's untoward effects. A program so sweeping is not sheltered by *Vernonia;* its unreasonable reach renders it impermissible under the Fourth Amendment.

## II

In *Chandler*, this Court inspected "Georgia's requirement that candidates for state office pass a drug test"; we held that the requirement "d[id] not fit within the closely guarded category of constitutionally permissible suspicionless searches." 520 U. S., at 309. Georgia's testing prescription, the record showed, responded to no "concrete danger," *id.*, at 319, was supported by no evidence of a particular problem, and targeted a group not involved in "high-risk, safety-sensitive tasks," *id.*, at 321–322. We concluded:

> "What is left, after close review of Georgia's scheme, is the image the State seeks to project. By requiring candidates for public office to submit to drug testing, Georgia displays its commitment to the struggle against drug abuse. . . . The need revealed, in short, is symbolic, not 'special,' as that term draws meaning from our case law." *Ibid.*

Close review of Tecumseh's policy compels a similar conclusion. That policy was not shown to advance the "'special needs' [existing] in the public school context [to maintain] . . . swift and informal disciplinary procedures . . . [and] order in the schools," *Vernonia*, 515 U. S., at 653 (internal quotation marks omitted). See *supra*, at 846–848, 849–853. What is left is the School District's undoubted purpose to heighten awareness of its abhorrence of, and strong stand against, drug abuse. But the desire to augment communica-

tion of this message does not trump the right of persons— even of children within the schoolhouse gate—to be "secure in their persons . . . against unreasonable searches and seizures." U. S. Const., Amdt. 4.

In *Chandler,* the Court referred to a pathmarking dissenting opinion in which "Justice Brandeis recognized the importance of teaching by example: 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.'" 520 U. S., at 322 (quoting *Olmstead* v. *United States,* 277 U. S. 438, 485 (1928)). That wisdom should guide decisionmakers in the instant case: The government is nowhere more a teacher than when it runs a public school.

It is a sad irony that the petitioning School District seeks to justify its edict here by trumpeting "the schools' custodial and tutelary responsibility for children." *Vernonia,* 515 U. S., at 656. In regulating an athletic program or endeavoring to combat an exploding drug epidemic, a school's custodial obligations may permit searches that would otherwise unacceptably abridge students' rights. When custodial duties are not ascendant, however, schools' tutelary obligations to their students require them to "teach by example" by avoiding symbolic measures that diminish constitutional protections. "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 637 (1943).

\* \* \*

For the reasons stated, I would affirm the judgment of the Tenth Circuit declaring the testing policy at issue unconstitutional.