Justice Ginsburg,
with whom Justice Breyer and Justice Sotomayor join, concurring in the judgment.
Is a former U. S. Attorney General subject to a suit for damages on a claim that he instructed subordinates to use the material-witness statute, 18 U. S. C. §3144, as a pretext to detain terrorist suspects preventively? Given Whren v. United States, 517 U. S. 806 (1996), I agree with the Court that no “clearly established law” renders Ashcroft answerable in damages for the abuse of authority al-Kidd charged. Ante, at 744. But I join Justice Sotomayor in objecting to the Court’s disposition of al-Kidd’s Fourth Amendment claim *748 on the merits; as she observes, post, at 751 (opinion concurring in judgment), that claim involves novel and trying questions that will “have no effect on the outcome of th[is] case.” Pearson v. Callahan, 555 U. S. 223, 236-237 (2009).
In addressing al-Kidd’s Fourth Amendment claim against Ashcroft, the Court assumes at the outset the existence of a validly obtained material witness warrant. Ante, at 733, 744. That characterization is puzzling. See post, at 752 (opinion of Sotomayor, J.).[1] Is a warrant “validly obtained” when the affidavit on which it is based fails to inform the issuing Magistrate Judge that “the Government has no intention of using [al-Kidd as a witness] at [another’s] trial,” post, at 751, and does not disclose that al-Kidd had cooperated with FBI agents each of the several times they had asked to interview him, App. 26?
Casting further doubt on the assumption that the warrant was validly obtained, the Magistrate Judge was not told that al-Kidd’s parents, wife, and children were all citizens and residents of the United States. In addition, the affidavit misrepresented that al-Kidd was about to take a one-way flight to Saudi Arabia, with a first-class ticket costing approximately $5,000; in fact, al-Kidd had a round-trip, coach-class ticket that cost $1,700.[2] Given these omissions and *749 misrepresentations, there is strong cause to question the Court’s opening assumption — a valid material witness warrant — and equally strong reason to conclude that a merits determination was neither necessary nor proper.[3]
*750 I also agree with Justice Kennedy that al-Kidd’s treatment presents serious questions, unaddressed by the Court, concerning “the [legality of] the Government’s use of the material-witness statute in this case.” Ante, at 744 (concurring opinion). In addition to the questions Justice Kennedy poses, and even if the initial material witness classification had been proper, what even arguably legitimate basis could there be for the harsh custodial conditions to which al-Kidd was subjected: Ostensibly held only to secure his testimony, al-Kidd was confined in three different detention centers during his 16 days’ incarceration, kept in high-security cells lit 24 hours a day, strip-searched and subjected to body-cavity inspections on more than one occasion, and handcuffed and shackled about his wrists, legs, and waist. App. 29-36; cf. Bell v. Wolfish, 441 U. S. 520, 539, n. 20 (1979) (“[L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, *751 employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.”).
However circumscribed al-Kidd’s Bivens claim against Ashcroft may have been, see Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971); ante, at 740 (majority opinion); ante, at 744 (Kennedy, J., concurring), his remaining claims against the FBI agents who apprehended him invite consideration of the issues Justice Kennedy identified.[4] His challenges to the brutal conditions of his confinement have been settled. But his ordeal is a grim reminder of the need to install safeguards against disrespect for human dignity, constraints that will control officialdom even in perilous times.

 Nowhere in al-Kidd’s complaint is there any concession that the warrant gained by the FBI agents was validly obtained. But ef. ante, at 740, n. 3 (majority opinion).

 Judicial officers asked to issue material witness warrants must determine whether the affidavit supporting the application shows that “the testimony of a person is material in a criminal proceeding” and that “it may become impracticable to secure the presence of the person by subpoena.” 18 U. S. C. §3144. Even if these conditions are met, issuance of the warrant is discretionary. Ibid, ("judicial officer may order the arrest of the person” (emphasis added)). Al-Kidd’s experience illustrates the importance of vigilant exercise of this checking role by the judicial officer to whom the warrant application is presented.
The affidavit used to secure al-Kidd’s detention was spare; it did not state with particularity the information al-Kidd purportedly possessed, nor did it specify how al-Kidd’s knowledge would be material to Sami *749 Omar al-Hussayen’s prosecution. As to impracticability, the affidavit contained only this unelaborated statement: “It is believed that if Al-Kidd travels to Saudi Arabia, the United States Government will be unable to secure his presence at trial via subpoena.” App. 64. Had the Magistrate Judge insisted on more concrete showings of materiality and impracticability, al-Kidd might have been spared the entire ordeal.

 The Court thrice states that the material witness warrant for al-Kidd’s arrest was “based on individualized suspicion.” Ante, at 738, 740. The word “suspicion,” however, ordinarily indicates that the person suspected has engaged in wrongdoing. See Black’s Law Dictionary 1585 (9th ed. 2009) (defining “reasonable suspicion” to mean “[a] particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity”). Material witness status does not “involv[e] suspicion, or lack of suspicion,” of the individual so identified. See Illinois v. Lidster, 540 U. S. 419, 424-425 (2004).
This Court’s decisions, until today, have uniformly used the term “individualized suspicion” to mean “individualized suspicion of wrongdoing.” See Indianapolis v. Edmond, 531 U. S. 32, 37 (2000) (emphasis added); Chandler v. Miller, 520 U. S. 305, 313 (1997) (same). See also, e. g., Brigham City v. Stuart, 547 U. S. 398, 405 (2006) (referring to “programmatic searches conducted without individualized suspicion — such as checkpoints to combat drunk driving or drug trafficking”); Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U. S. 822, 830 (2002) (“finding of individualized suspicion may not be necessary when a school conducts drug testing”); Whren v. United States, 517 U. S. 806, 817-818 (1996) (observed traffic violations give rise to individualized suspicion); Michigan Dept. of State Police v. Sitz, 496 U. S. 444, 451 (1990) (“Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard.”); Maryland v. Buie, 494 U. S. 325, 334-335, n. 2 (1990) (“Terry [v. Ohio, 392 U. S. 1 (1968),] requires reasonable, individualized suspicion before a frisk for weapons can be conducted.”); Treasury Employees v. Von Raab, 489 U. S. 656, 668 (1989) (“[I]n certain limited circumstances, the Government’s need to discover . . . latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify [search that intrudes) on privacy ... without any measure of individualized suspicion.”); O’Connor v. Ortega, 480 U. S. 709, 726 (1987) (“petitioners had an ‘individualized suspicion’ of *750 misconduct by Dr. Ortega”); United States v. Montoya de Hernandez, 473 U. S. 531, 538 (1985) (“Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion....”); New Jersey v. T L. O., 469 U. S. 325, 342, n. 8 (1985) (“the search of T. L. O.’s purse was based upon an individualized suspicion that she had violated school rules”); Michigan v. Summers, 452 U. S. 692, 699, n. 9 (1981) (“police executing a search warrant at a tavern could not . . . frisk a patron unless the officers had individualized suspicion that the patron might be armed or dangerous”).
The Court’s suggestion that the term “individualized suspicion” is more commonly associated with “knowfing] something about [a] crime” or “throwing ... a surprise birthday party” than with criminal suspects, ante, at 738, n. 2 (internal quotation marks omitted), is hardly credible. The import of the term in legal argot is not genuinely debatable. When the evening news reports that a murder “suspect” is on the loose, the viewer is meant to be on the lookout for the perpetrator, not the witness. Ashcroft understood the term as lawyers commonly do: He spoke of detaining material witnesses as a means to “tak[e] suspected terrorists off the street.” App. 41 (internal quotation marks omitted).

 The District Court determined that al-Kidd’s factual allegations against FBI agents regarding their “misrepresentations and omissions in the warrant application, if true, would negate the possibility of qualified immunity [for those agents].” Memorandum Order in No. cv:05-093 (D Idaho, Sept. 27, 2006), p. 18. The agents took no appeal from this threshold denial of their qualified immunity plea.