# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3268

_____

| | | |
|---|---|---|
| Jane Doe, by her parents and next friends Mr. and Mrs. John Doe, individually and on behalf of a plaintiff class consisting of all secondary public school students who have started the seventh grade in the Little Rock School District as of the 1999-2000 school year, | * * * * * * * * | |
| | * | Appeal from the United States |
| | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Little Rock School District, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 13, 2004
Filed: August 18, 2004

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and MELLOY, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This case requires us to decide whether the practice of the Little Rock School District (LRSD) that subjects secondary public school students to random, suspicionless searches of their persons and belongings by school officials is unconstitutional. We conclude that such searches violate the students' fourth

amendment rights because they unreasonably invade their legitimate expectations of privacy.

Jane Doe is a secondary school student in the LRSD. One day during the school year, all of the students in Ms. Doe's classroom were ordered to leave the room after removing everything from their pockets and placing all of their belongings, including their backpacks and purses, on the desks in front of them. While the students were in the hall outside their classroom, school personnel searched the items that the students had left behind, including Ms. Doe's purse, and they discovered marijuana in a container in her purse. The parties have stipulated that LRSD has a practice of regularly conducting searches of randomly selected classrooms in this manner.

In her amended complaint, Ms. Doe, individually and on behalf of a class of "all secondary public school students who have started seventh grade in the [LRSD] as of the 1999-2000 school year," claimed that this method of conducting searches is unconstitutional, and sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. After certifying the case as a class action, the district court entered judgment for the LRSD and dismissed the complaint with prejudice. We reverse.

I.

The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The fourteenth amendment extends this constitutional guarantee to searches by state officers, including public school officials. *See New Jersey v. T.L.O.*, 469 U.S. 325, 334-37 (1985). "In carrying out searches ... school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment." *Id.* at 336-37. "Reasonableness" is "the touchstone of the constitutionality of a governmental search," *Board of Educ. of*

*Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 828 (2002), and the relevant constitutional question in school search cases is "whether the search was reasonable in all the circumstances," *Thompson v. Carthage Sch. Dist.*, 87 F.3d 979, 982 (8th Cir. 1996).

In determining whether a particular type of school search is constitutionally reasonable, we engage in a fact-specific "balancing" inquiry, under which the magnitude of the government's need to conduct the search at issue is weighed against the nature of the invasion that the search entails. "On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order." *T.L.O.*, 469 U.S. at 337.

The Supreme Court has developed a framework designed to make the required balancing of privacy and security interests somewhat less amorphous than it might otherwise be. A reviewing court is to consider first the "scope of the legitimate expectation of privacy at issue," then the "character of the intrusion that is complained of," and finally the "nature and immediacy of the governmental concern at issue" and the efficacy of the means employed for dealing with it. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654-66 (1995). The district court addressed each of these considerations in turn, and decided that they all supported the conclusion that the search practice involved in this case was reasonable. In particular, the district court stated in its order that LRSD students have only a "limited privacy interest," and that the search practice is "minimally intrusive, is preceded by adequate notice, is motivated by a significant policy concern, and is directed towards an immediate, legitimate need." Given these determinations, the district court held that "the search policy" was constitutional because it "reasonably serves the school district's important interest in detecting and preventing drug use among its students." In reaching this conclusion, the district court relied heavily on two recent cases in which the Supreme Court upheld school district policies that allowed only those

-3-

students who agree to be subject to random drug testing to participate in school athletics or other competitive extracurricular activities. *See Vernonia*, 515 U.S. at 648, 664-65; *Earls*, 536 U.S. at 825.

After reviewing the reasonableness issue *de novo*, we conclude that the district court underestimated the extent to which the LRSD's search practice intrudes upon its students' legitimate privacy interests, and overestimated the substantiality of the LRSD's factual showing that such an intrusion was necessary to address a significant difficulty in the schools. Students presumptively have a legitimate, though limited, expectation of privacy in the personal belongings that they bring into public schools. Because subjecting students to full-scale, suspicionless searches eliminates virtually all of their privacy in their belongings, and there is no evidence in the record of special circumstances that would justify so considerable an intrusion, we hold that the search practice is unconstitutional.

## II.

We ask first whether secondary public school students in the LRSD retain any legitimate expectations of privacy. The district court, quoting *Earls*, 536 U.S. at 830, noted that a " 'student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety.' " Students in public schools do indeed have lesser expectations of privacy than people generally have in public situations, due in large part to the government's responsibilities "as guardian and tutor of children entrusted to its care." *Vernonia*, 515 U.S. at 665 (footnote omitted). Public school students' privacy interests, however, are not nonexistent. We think it is clear that schoolchildren are entitled to expect some degree of privacy in the personal items that they bring to school.

As a general matter, "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view," *United States v. Ross*, 456 U.S. 798, 822-23 (1982), and public school students thus retain a protection

against "unreasonable" searches of their backpacks and purses by school officials. Schoolchildren have a legitimate need to bring items of personal property into their schools, which are their "homes away from home" where they are required by compulsory attendance laws to spend a substantial portion of their waking hours. They "at a minimum must bring to school not only the supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming," and they may also carry with them "such nondisruptive yet highly personal items as photographs, letters, and diaries." *T.L.O.*, 469 U.S. at 339. Unlike prisoners, who "retain no legitimate expectations of privacy in their cells" after having been convicted and incarcerated, *see id.* at 338, public school students have traditionally been treated as presumptively responsible persons entitled to some modicum of privacy in their personal belongings, at least to the extent that recognition of such privacy interests does not unduly burden the maintenance of security and order in schools.

The Supreme Court has observed that there is a tension between the types of privacy "interests protected by the Fourth Amendment and the interest of the States in providing a safe environment conducive to education in the public schools," *id.* at 332 n.2, and has concluded that the fourth amendment allows school officials some flexibility in resolving this tension. But it has characterized as "severely flawed" a state's argument that "because of the pervasive supervision to which children in the schools are necessarily subject, a child has virtually no legitimate expectation of privacy in articles of personal property 'unnecessarily' carried into a school." *Id.* at 338. While the Court has acknowledged that students' privacy rights are limited due to the "difficulty of maintaining discipline in the public schools," and that "drug use and violent crime in the schools have become major social problems," it has stated that "the situation is not so dire that students in the schools may claim no legitimate expectations of privacy." *Id.* at 338-39.

It is true that the legitimate expectation of privacy retained by members of certain sub-populations of a public school's student body falls below the already limited baseline level of privacy afforded to public school students generally. For instance, the Supreme Court has analogized students who voluntarily participate in school athletics or other competitive extracurricular activities to adults who choose to participate in a "closely regulated industry," in that both groups voluntarily subject themselves to "intrusions upon normal rights and privileges, including privacy." *Vernonia*, 515 U.S. at 656-57 (internal quotations omitted); *Earls*, 536 U.S. at 831-32. Sports and other competitive extracurricular activities usually have separate systems of rules that do not apply to the student body as a whole, and often involve such requirements as mandatory physicals, frequent communal undress, and traveling and lodging in close confines. By consciously choosing to "go out for the team" or other competitive extracurricular endeavor, such students agree to waive certain privacy expectations that they would otherwise have as students in exchange for the privilege of participating in the activity. But the search regime at issue here is imposed upon the entire student body, so the LRSD cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege.

As the district court noted, a passage that was added to the LRSD's current Secondary Student Rights and Responsibilities Handbook, which is distributed to students at the beginning of the school year, provides that "[b]ook bags, backpacks, purses and similar containers are permitted on school property as a convenience for students," and that "[i]f brought onto school property, such containers and their contents are at all times subject to random and periodic inspections by school officials." But we do not think that this handbook passage has effected a waiver by LRSD students of any expectations of privacy that they would otherwise have. The students are required by state law to attend school, and have not entered into a contract that incorporates the handbook or voluntarily assented to be bound by its terms. The lack of mutual consent to the student handbook makes it fundamentally

different from an employee handbook, which may create an enforceable contract between an employer and employee under traditional contract principles. The LRSD may not deprive its students of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored.

## III.

Given that public school students retain some legitimate expectation of privacy in their persons and belongings, we are bound to inquire into the character of the intrusion that the LRSD's search practice imposes. We respectfully disagree with the district court's determination that the search practices of the LRSD are "minimally intrusive."

Unlike the suspicionless searches of participants in school sports and other competitive extracurricular activities that the Supreme Court approved in *Vernonia* and *Earls*, in which "the privacy interests compromised by the process" of the searches were deemed "negligible," *Vernonia*, 515 U.S. at 658, *see Earls*, 536 U.S. at 832-33, the type of search at issue here invades students' privacy interests in a major way. "A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *T.L.O.*, 469 U.S. at 337-38 (footnote omitted). Students often carry items of a personal or private nature in their pockets and bags, and many students (whether or not they are carrying contraband) must surely feel uncomfortable or embarrassed when officials decide to rifle through their personal belongings.

Whatever privacy interests the LRSD students have in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here, because all such belongings are subject to being searched at any time without notice, individualized suspicion, or any apparent limit to the extensiveness of the search. Full-scale searches that involve people rummaging through personal belongings

concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs. Indeed, dogs and magnetometers are often employed in conducting constitutionally reasonable large-scale "administrative" searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches. The type of search that the LRSD has decided to employ, in contrast, is highly intrusive, and we are not aware of any cases indicating that such searches in schools pass constitutional muster absent individualized suspicion, consent or waiver of privacy interests by those searched, or extenuating circumstances that pose a grave security threat.

Another relevant consideration is the purpose for which the fruits of the searches at issue are used. In *Vernonia* and *Earls*, which involved drug testing of voluntary participants in competitive extracurricular activities, the results of the searches at issue were never disclosed to law enforcement authorities, and the most serious form of discipline that could possibly result from failing the tests was exclusion from the relevant extracurricular activities. *See Earls*, 536 U.S. at 833; *Vernonia*, 515 U.S. at 651. The Court in *Earls*, 536 U.S. at 834, found that "the limited uses to which the test results are put" contributed significantly to a conclusion that the invasion of the students' privacy was insignificant. In sharp contrast to these cases, the fruits of the searches at issue here are apparently regularly turned over to law enforcement officials and are used in criminal proceedings against students whose contraband is discovered. In fact, Ms. Doe was convicted of a misdemeanor as a result of the search of her purse. Because the LRSD's searches can lead directly to the imposition of punitive criminal sanctions, the character of the intrusions is qualitatively more severe than that in *Vernonia* and *Earls*. Rather than acting *in loco parentis*, with the goal of promoting the students' welfare, the government officials conducting the searches are in large part playing a law enforcement role with the goal of ferreting out crime and collecting evidence to be used in prosecuting students.

IV.

We consider finally the nature and immediacy of the governmental concerns that gave rise to the searches at issue here. A sliding scale is used in evaluating the reasonableness of a search, that is, the government is entitled to inflict more serious intrusions upon legitimate expectations of privacy as the governmental interest served by the intrusions becomes more compelling. A governmental interest need not meet some "fixed, minimum quantum of governmental concern," but merely has to be "*important enough* to justify the particular search at hand," considering the degree of its intrusiveness. *Vernonia*, 515 U.S. at 661. The district court determined that the LRSD's search practice is "directed towards an immediate, legitimate need." It failed, however, to point to any evidence indicating that the LRSD has experienced any significant and immediate difficulties sufficient to give rise to a special need for such an unprecedented practice.

We conclude that the LRSD has in fact failed to demonstrate the existence of a need sufficient to justify the substantial intrusions upon the students' privacy interests that the search practice entails. While the LRSD has expressed some generalized concerns about the existence of weapons and drugs in its schools, it conceded at oral argument that there is nothing in the record regarding the magnitude of any problems with weapons or drugs that it has actually experienced. All schools surely have an interest in minimizing the harm that the existence of weapons and controlled substances might visit upon a student population, but public schools have never been entitled to conduct random, full-scale searches of students' personal belongings because of a mere apprehension.

In both *Vernonia* and *Earls*, the principal cases relied on by the LRSD, the school districts offered particularized evidence to "shore up" their assertions of a special need to institute administrative search programs for extracurricular-activity participants. *See Earls*, 536 U.S. at 835. In *Vernonia*, the record demonstrated that "a large segment of the student body, particularly those involved in interscholastic

athletics, was in a state of rebellion," "disciplinary actions had reached 'epidemic proportions,' " and "the rebellion was being fueled by alcohol and drug abuse." *Vernonia*, 515 U.S. at 662-63. The Court emphasized, moreover, that the school district had particularly compelling safety concerns because its "athletes were the leaders of the drug culture" and "drug use increases the risk of sports-related injury." *Id.* at 649. Similarly, in *Earls*, the school district had "presented specific evidence of drug use" at its schools, leading to the district court's finding that the school district was "faced with a 'drug problem' when it adopted the policy." *Earls*, 536 U.S. at 834-35.

We have upheld a blanket school search somewhat like the one at issue here when school officials had received specific information giving them reasonable grounds to believe that the students' safety was in jeopardy. In *Thompson*, 87 F.3d at 980, 982-83, we determined that a single "generalized but minimally intrusive search" of all male students in the sixth through twelfth grades for knives and guns was "constitutionally reasonable" because "fresh cuts" on the seats of a school bus and student reports that there was a gun at the school that morning provided particularized evidence that there were dangerous weapons present on school grounds. In *Thompson*, as in *Earls* and *Vernonia*, random, suspicionless searches by school officials were deemed reasonable only after a specific showing was made that not engaging in the searches would have jeopardized some important governmental interest. No such showing has been made here.

V.

While the line separating reasonable and unreasonable school searches is sometimes indistinct, we think it plain enough that the LRSD's search practice crosses it. In light of the government's legitimate interest in maintaining discipline and safety in the public schools, the privacy that students in those schools are reasonably entitled to expect is limited. The LRSD's search practice, however, effectively reduces these expectations to nothing, and the record contains no evidence of unique circumstances

that would justify significant intrusions. The mere assertion that there are substantial problems associated with drugs and weapons in its schools does not give the LRSD *carte blanche* to inflict highly intrusive, random searches upon its general student body. We therefore reverse the judgment of the district court, and we remand for entry of a judgment not inconsistent with this opinion.

BEAM, Circuit Judge, concurring and dissenting.

In this case, Jane Doe asserts an individual claim plus an additional claim as the class representative for "all secondary public school students who have started the seventh grade in the Little Rock School District (LRSD) as of the 1999-2000 school year." I concur in the result reached by the court in Doe's individual claim but dissent from the court's conclusions in the class claim. More specifically, I disagree with the court's ruling, which enjoins LRSD from conducting "suspicionless searches of [students'] persons and belongings" since "such searches violate the students' fourth amendment rights because they unreasonably invade their legitimate expectations of privacy." Ante at 1-2. I respectfully suggest that neither the facts stipulated by the parties nor applicable precedent support this conclusion.

At the outset, I question the certification of a class in this matter, notwithstanding the failure of LRSD to object. Initially, Doe asserted a claim contending that the LRSD policy was unconstitutional on its face and as applied to her. Upon motion of LRSD, the facial claim was dismissed and as noted in the first footnote of Doe's opening brief, "[t]he constitutionality of the Policy, on its face, is not an issue in this appeal."

In an amended complaint, Doe asserted the class claim, and argued that the action was "maintainable under either Rule 23(b)(2) or 23(b)(3), . . . [but] would be best pursued under Rule 23(b)(2)." LRSD did not object, in essence permitting the

reassertion of the previously dismissed facial claim.  As a result, the validity of the class was never addressed by the trial court.

Many students at LRSD (and their parents) may and likely do support the implementation of the LRSD policy for personal security reasons.  Since each of them is entitled, for whatever reason, to waive his or her Fourth Amendment rights, Rule 23(b) (either (2) or (3)) cannot be invoked in this case because Rule 23(a)(4) has not been fulfilled.  Doe simply cannot "fairly and adequately protect the interests" of those members of the class who would not assert their rights.  Fed. R. Civ. P. 23(a)(4); see, e.g., Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 485-87 (5th Cir. 1982) (addressing appropriate ways of dealing with intraclass antagonism).

But even if the interests of antagonistic class members were properly represented by Doe (or otherwise accounted for), the class claim fails for an even more important reason:  Fourth Amendment rights are personal and may not be asserted vicariously.  United States v. Monie, 907 F.2d 793, 794 (8th Cir. 1990) (citing United States v. Nabors, 761 F.2d 465, 468 (8th Cir. 1985)).  And the existence of an expectation of privacy has a subjective facet.  Oliver v. United States, 466 U.S. 170, 177-78 (1984); United States v. Mendoza, 281 F.3d 712, 715 (8th Cir.), cert. denied 537 U.S. 1004 (2002).[1]  So, given the nature of these rights, there needs

---

[1]Unlike the court, I believe the student handbook affects this subjective facet of the expectation of privacy.  While I generally agree that the government cannot "deprive its [citizens] of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored," ante at 7, I do believe that an entity charged with "custodial and tutelary responsibilities," Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls, 536 U.S. 822, 830 (2002) (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656 (1995)), can affect its subjects' expectations of privacy.  As explained below, in the case of Doe individually, exceeding those responsibilities impacts the analysis and could give rise to a constitutional violation.

For this reason, I also do not believe contractual notions of waiver are

to be a determination that each member of the class has a legitimate expectation of privacy based upon the facts stipulated. United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994); United States v. Macklin, 902 F.2d 1320, 1330 (8th Cir. 1990). This did not occur, nor could it have occurred given the evidence available. Thus, the district court's dismissal of the purported class claim was correct.

I agree with almost every aspect of the court's discussion of the law concerning diminished expectations of privacy enjoyed by students in connection with secondary school search policies. My quibble with the court involves the evidence presented and how the court evaluates it under established precedent. In my view, the facts stipulated make Doe's case extremely close, but in no way establish a class-wide violation.

The court correctly notes that a student's expectation of privacy does not disappear within the framework of school searches. Vernonia School District 47J v. Acton, 515 U.S. 646 (1995), Board of Education of Independent School District No. 92 v. Earls, 536 U.S. 822 (2002), and this circuit's later interpretations of these rulings confirm this notion. But those same cases make any expectation of privacy almost indiscernible under the facts of this case.

In my view, Vernonia and Earls appreciate the limited expectation of privacy, but allow a school to search if the search is not too intrusive, if the school's concerns are immediate, and if the means employed to serve the school's concerns serve that

---

applicable in the school setting. Rather, the handbook in a public school has a notice function to which voluntary participation in, for example, extra-curricular activities is irrelevant. Thus, I don't think the fact that students are subject to compulsory education really matters because "mutual consent" (sometimes evident on the student's part by his voluntary participation) is unnecessary. And even if contractual notions of waiver were applicable, why, given the handbook's warning, does the student's voluntary use of a portable container not constitute a waiver?

immediate concern. Obviously, this test is vague. After all, it is a balance with which we are dealing—an earnest effort to delineate the notion of reasonableness in the context of government action. Thus, a useful benchmark is prior cases that have applied this test.

It seems to me that the "nature of the intrusion" in this case was noticeably less intrusive than the extraction and testing of body fluids discussed in <u>Earls</u> and <u>Vernonia</u> and tends to support an affirmance of the district court. But it is the immediacy of the school's concerns that I believe is misstated here. I agree with Judge Bowman's opinion in <u>Miller v. Wilkes</u>, 172 F.3d 574 (8th Cir. 1999) (now vacated because of Miller's exodus from the subject school system). Judge Bowman, acknowledging <u>Vernonia,</u> states, "Drug and alcohol abuse in public schools is a serious social problem today in every part of the country. (Indeed, to the extent any party thinks it necessary to do so, we take judicial notice of that fact. <u>See</u> <u>Fed. R. Evid.</u> 201 (generally known fact).)" The same is true, I submit, with the dangers of weapons that may pose threats of bodily harm to members of the student body. And, in this case, the stipulated facts address that specific problem.

13. LRSD believes that the ability to randomly search students [sic] book bags, backpacks, purses and similar containers is necessary to discourage, and hopefully prevent, students from bringing weapons and drugs into LRSD's secondary schools.

14. Since implementation of its search policy, LRSD has discovered and disciplined student [sic] for bringing weapons to school as small as razor blades. There have also been incidents in which students have attempted to use razor blades as weapons.

<u>Doe v. Little Rock Sch. Dist.</u>, No. LR-C-99-386, Joint Stipulation of Facts (E.D. Ark. July 17, 2000). If the search was justified because of the school's weaponry concerns, but merely incidentally detected drugs, there would be no Fourth Amendment issue.

Accordingly, I believe that LRSD has amply demonstrated an immediate concern that justifies the intrusion upon each class member's privacy interests. And I believe the random searches serve that concern by deterring possession.

Finally, although a close question on the stipulated facts and the evidence the district court was entitled to consider through judicial notice, I agree with the court's analysis of Doe's individual claim. The distinguishing feature to me is the police involvement in the fruits of Doe's search. I do not see any evidence in the record showing that other class members suffered this sanction or that the school, as a matter of practice or policy, always turns the fruits over to police, although the policy allows them to do so.[2] In my view, this has a profound impact on the way in which we should view this case. Although I don't believe this fact takes the case out of the Vernonia and Earls test for reasonableness—i.e., it does not make a warrant or probable cause necessary in a situation such as this, Cason v. Cook, 810 F.2d 188, 192 (8th Cir. 1987)—I do believe it affects the bottom-line reasonableness inquiry. See id. at 193.

As noted by the court, in Vernonia and Earls the results of the searches at issue were never disclosed to law enforcement authorities. Nor were they disclosed in Miller. 172 F.3d at 579-80. Here they were, and a criminal prosecution ensued. By turning the fruits of its search over to police, the school reduced the extent to which it was acting under its "'custodial and tutelary responsibility'" Earls, 536 U.S. at 830 (quoting Vernonia, 515 U.S. at 656), and instead, brought it much closer to acting in the investigatory role for which the probable-cause standard is intended. Id. at 828. In other words, its "special needs," Vernonia, 515 U.S. at 653, became ordinary.

This was no small act. A school board's members are quite sensitive to the objections of its electorate. And that electorate, given the focused responsibilities of

_____

[2]Again, the constitutionality of the policy as written is not at issue here.

-15-

the school board, is particularly observant of how the school treats students. Law enforcement, though a government actor that is subject to political pressure, is subject to the will of a different electorate. That electorate may be unversed in the problems of LRSD or concerned with the numerous other problems with which its elected officials (e.g., sheriffs, chiefs of police, or county attorneys) must deal. Thus, political pressure is less likely to protect students from unreasonable searches through its impact on law enforcement, than it is through its impact on school governance. LRSD, by calling upon this other government actor, diminished the extent to which we could rely on political processes to keep the government in check and, thus, introduced the need for a particular level of constitutional limitation.

The diminished expectation of privacy was also not so diminished. It is one thing for a student to expect, and society to allow, a search that remains within the school walls. It is quite another to expect tolerance when those searches invoke the criminal justice system.[3]

Ironically, calling upon the police after random searches probably heightens the extent to which the searches serve a school's immediate concern with deterrence and thereby may make other students safer. But it also brings into the picture notions of detection and criminal punishment—not-so-peculiar facets of police work—that make the student's shepherd much more like the criminal's.

On balance, I conclude that the school district's search was unreasonable as to Doe. Thus, the declaratory judgment and injunction should issue on Doe's behalf. If, however, LRSD conducts its searches without individualized suspicion and refrains from sharing the fruits thereof with the police, I believe its actions are fully constitutional. The class has shown no more than that here. In sum, I concur in the

---

[3]Relatedly, subjecting an individual to criminal sanction is an intrusive measure, though perhaps this does not make the search itself any more intrusive.

-16-

court's reversal regarding Doe's individual claim but would affirm the district court on the class claim.

_____