# Status of Certain Opinions Issued in the Aftermath of the Terrorist Attacks of September 11, 2001

Certain propositions stated in several opinions issued by the Office of Legal Counsel in 2001–2003 respecting the allocation of authorities between the President and Congress in matters of war and national security do not reflect the current views of this Office.

January 15, 2009

MEMORANDUM OPINION FOR THE FILES

The purpose of this memorandum is to confirm that certain propositions stated in several opinions issued by the Office of Legal Counsel ("OLC") in 2001–2003 respecting the allocation of authorities between the President and Congress in matters of war and national security do not reflect the current views of this Office. We have previously withdrawn or superseded a number of opinions that depended upon one or more of these propositions. For reasons discussed herein, today we explain why these propositions are not consistent with the current views of OLC, and we advise that caution should be exercised before relying in other respects on the remaining opinions identified below.[1]

The opinions addressed herein were issued in the wake of the atrocities of 9/11, when policy makers, fearing that additional catastrophic terrorist attacks were imminent, strived to employ all lawful means to protect the Nation. In the months following 9/11, attorneys in the Office of Legal Counsel and in the Intelligence Community confronted novel and complex legal questions in a time of great danger and under extraordinary time pressure. Perhaps reflecting this context, several of the opinions identified below do not address specific and concrete policy proposals, but rather address in general terms the broad contours of legal issues potentially raised in the uncertain aftermath of the 9/11 attacks. Thus, several of these opinions represent a departure from this Office's preferred practice of rendering formal opinions addressed to particular policy

---

[1] This memorandum supplements the Memorandum for the Files from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: October 23, 2001 OLC Opinion Addressing the Domestic Use of Military Force to Combat Terrorist Activities* (Oct. 6, 2008). Neither memorandum is intended to suggest in any way that the attorneys involved in the preparation of the opinions in question did not satisfy all applicable standards of professional responsibility.

proposals and not undertaking a general survey of a broad area of the law or addressing general or amorphous hypothetical scenarios involving difficult questions of law.

Mindful of this extraordinary historical context, we nevertheless believe it appropriate and necessary to confirm that the following propositions contained in the opinions identified below do not currently reflect, and have not for some years reflected, the views of OLC. This Office has not relied upon the propositions addressed herein in providing legal advice since 2003, and on several occasions we have already acknowledged the doubtful nature of these propositions.

## I. Congressional Authority Over Captured Enemy Combatants

A number of OLC opinions issued in 2002–2003 advanced a broad assertion of the President's Commander in Chief power that would deny Congress any role in regulating the detention, interrogation, prosecution, and transfer of enemy combatants captured in the global War on Terror. The President certainly has significant constitutional powers in this area, but the assertion in these opinions that Congress has no authority under the Constitution to address these matters by statute does not reflect the current views of OLC and has been overtaken by subsequent decisions of the Supreme Court and by legislation passed by Congress and supported by the President. The following opinions contain variations of this proposition:

1. Memorandum for William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Power as Commander in Chief to Transfer Captured Terrorists to the Control and Custody of Foreign Nations* at 4–5 (Mar. 13, 2002) ("Detainee Transfer Opinion") (asserting that "the power to dispose of the liberty of individuals captured and brought under the control of United States armed forces during military operations remains in the hands of the President alone" because the Constitution does not "specifically commit[] the power to Congress"; "The treatment of captured enemy soldiers is but one of the many facets of the conduct of war, entrusted by the Constitution in plenary fashion to the President by virtue of the Commander-

in-Chief Clause. Moreover, it is an area in which the President appears to enjoy exclusive authority, as the power to handle captured enemy soldiers is not reserved by the Constitution in whole or in part to any other branch of the government.").

2. Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Swift Justice Authorization Act* at 2, 12 (Apr. 8, 2002) ("Swift Justice Opinion") ("Indeed, Congress may no more regulate the President's ability to convene military commissions or to seize enemy belligerents than it may regulate his ability to direct troop movements on the battlefield."; "Precisely because [military] commissions are an instrument used as part and parcel of the conduct of a military campaign, congressional attempts to dictate their precise modes of operation interfere with the means of conducting warfare no less than if Congress were to attempt to dictate the tactics to be used in an engagement against hostile forces.").

3. Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C § 4001(a) to Military Detention of United States Citizen* at 10 (June 27, 2002) ("Congress may no more regulate the President's ability to detain enemy combatants than it may regulate his ability to direct troop movements on the battlefield.").

4. Memorandum for Alberto R. Gonzales, Counsel to the President, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Standards of Conduct for Interrogation under 18 U.S.C. §§ 2340–2340A* at 35, 39 (Aug. 1, 2002) ("Interrogation Standards Opinion") ("Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield."; "Any effort by Congress to regulate the interrogation of battlefield combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President.") (previously withdrawn).

5. Memorandum for William J. Haynes II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Military Interrogation of Unlawful Enemy Combatants Held Outside the United States* at 13, 19 (Mar. 14, 2003) (declassified by Department of Defense, Mar. 31, 2008) ("Military Interrogation Opinion") ("In our view, Congress may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield."; "Congress can no more interfere with the President's conduct of the interrogation of enemy combatants than it can dictate strategic or tactical decisions on the battlefield.") (previously withdrawn).

OLC has already withdrawn the last two opinions listed above, the Interrogation Standards Opinion and the Military Interrogation Opinion. *See Definition of Torture Under 18 U.S.C. §§ 2340–2340A*, 28 Op. O.L.C. 294 (2004); Letter for William J. Haynes II, General Counsel, Department of Defense, from Daniel B. Levin, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Memorandum for William J. Haynes II, General Counsel of the Department of Defense, from John Yoo, Deputy Assistant Attorney General, Office of Legal Counsel*, Re: Military Interrogation of Alien Unlawful Combatants Held Outside the United States *(March 14, 2003) ("March 2003 Memorandum")* (Feb. 4, 2005). We have also previously expressed our disagreement with the specific assertions excerpted from the Interrogation Standards Opinion:

> The August 1, 2002, memorandum reasoned that "[a]ny effort by Congress to regulate the interrogation of battlefield combatants would violate the Constitution's sole vesting of the Commander-in-Chief authority in the President." I disagree with that view.

Responses of Steven G. Bradbury, Nominee to be Assistant Attorney General for the Office of Legal Counsel, to Questions for the Record from Senator Edward M. Kennedy, at 2 (Oct. 24, 2005).

> The federal prohibition on torture, 18 U.S.C. §§ 2340–2340A, is constitutional, and I believe it does apply as a general matter to the subject of detention and interrogation of detainees conducted pursuant to the President's Commander in Chief authority. The statement to the contrary from the August 1, 2002, memorandum, quoted

above, has been withdrawn and superseded, along with the entirety of the memorandum, and in any event I do not find that statement persuasive. The President, like all officers of the Government, is not above the law. He has a sworn duty to preserve, protect, and defend the Constitution and faithfully to execute the laws of the United States, in accordance with the Constitution.

Responses of Steven G. Bradbury, Nominee to be Assistant Attorney General for the Office of Legal Counsel, to Questions for the Record from Senator Richard J. Durbin, at 1 (Oct. 24, 2005).

Here, we record our conclusion that the assertions excerpted above are not the position of OLC.

It is well established that the President has broad authority as Commander in Chief to take military actions in defense of the country. *See, e.g.*, *Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980) ("The power to deploy troops abroad without the initiation of hostilities is the most clearly established exercise of the President's general power as a matter of historical practice."); *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941) (recognizing the President's authority to "dispose of troops and equipment in such manner and on such duties as best to promote the safety of the country"). Furthermore, this Office has recognized that Congress may not unduly constrain or inhibit the President's exercise of his constitutional authority in these areas. *See, e.g.*, *Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C 182, 185 (1996) (Congress "may not unduly constrain or inhibit the President's authority to make and to implement the decisions that he deems necessary or advisable for the successful conduct of military missions in the field"). We have no doubt that the President's constitutional authority to deploy military and intelligence capabilities to protect the interests of the United States in time of armed conflict necessarily includes authority to effectuate the capture, detention, interrogation, and, where appropriate, trial of enemy forces, as well as their transfer to other nations. *Cf., e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality opinion) (describing important incidents of war).

At the same time, Article I, Section 8 of the Constitution also grants significant war powers to Congress. We recognize that a law that is constitutional in general may still raise serious constitutional issues if

applied in particular circumstances to frustrate the President's ability to fulfill his essential responsibilities under Article II. Nevertheless, the sweeping assertions in the opinions above that the President's Commander in Chief authority categorically precludes Congress from enacting any legislation concerning the detention, interrogation, prosecution, and transfer of enemy combatants are not sustainable.

Congress's power to "define and punish . . . Offences against the Law of Nations," U.S. Const. art. I, § 8, cl. 10, provides a basis for Congress to establish the federal crime of torture, in accordance with U.S. treaty obligations under the Convention Against Torture, and the War Crimes Act offenses, in accordance, for example, with the "grave breach" provisions of the Geneva Conventions. This grant of authority also provides a basis for Congress to establish a statutory framework, such as that set forth in the Military Commissions Act of 2006, for trying and punishing unlawful enemy combatants for violations of the law of war and other hostile acts in support of terrorism. Without suggesting that congressional enactment was necessary to authorize the establishment of military commissions, the President's support for enactment of the Military Commissions Act following the Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), confirms this view. The prior opinion of this Office suggesting that Congress has no role to play concerning the prosecution of enemy combatants is incorrect. *See* Swift Justice Opinion at 17–19. Furthermore, the power "[t]o make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, gives Congress a basis to establish standards governing the U.S. military's treatment of detained enemy combatants, including standards for, among other things, detention, interrogation, and transfer to foreign nations. This grant of authority would support, for example, the provisions of the Detainee Treatment Act of 2005 that address the treatment of alien detainees held in the custody of the Department of Defense. We disagree with the suggestion in the Detainee Transfer Opinion that this Clause does not permit Congress to establish standards of conduct for the military's handling of detainees, but rather "is limited to the discipline of U.S. troops." *Id*. at 5.

The Captures Clause, which grants Congress power to "make Rules concerning Captures on Land and Water," U.S. Const. art. I, § 8, cl. 11, also would appear to provide separate authority for Congress to legislate with respect to the treatment and disposition of enemy combatants cap-

tured by the United States in the War on Terror. Two of the opinions identified above reasoned that the Captures Clause grants authority to Congress only with respect to captured enemy property, such as enemy vessels seized on the high seas or materiel taken on the battlefield, and not captured persons, such as the fighters or supporters of al Qaeda and its affiliates who are detained by the United States in the global War on Terror. *See* Swift Justice Opinion at 16–17; Detainee Transfer Opinion at 5. This Office has substantial doubts about that view.

Sources from around the time of the Framing suggest that the Founders understood battlefield "captures" to include the capture of enemy prisoners. During the Revolutionary War, the Continental Congress passed legislation concerning not simply the capture of enemy vessels, but also the capture and treatment of persons on board those vessels. *See, e.g.*, 4 *Journals of the Continental Congress 1774–1789* 254 (1906) (Worthington Chauncey Ford ed., 2005) (prohibiting the treatment of persons "contrary to common usage, and the practice of civilized nations in war"); 10 *Journals of the Continental Congress 1774–1789* 295 (1908) (Worthington Chauncey Ford ed., 2005) ("[I]f the enemy will not consent to exempt citizens from capture, agreeably to the law of nations, the commissioners be instructed positively to insist on their exchange, without any relation to rank."). Likewise, in 1801, Alexander Hamilton observed that belligerents in war have the right "to capture the persons and property of each other." Alexander Hamilton, *The Examination* No. 1 (Dec. 17, 1801) (emphasis added), *quoted in* 3 *The Founders' Constitution* 100 (Philip B. Kurland & Ralph Lerner eds., 1997); *see also id.* ("War, of itself, gives to the parties a mutual right to kill in battle, and to capture the persons and property of each other. This is a rule of natural law; a necessary and inevitable consequence of the state of war."). Other early commentators similarly understood the "law of capture" to encompass the capture of prisoners of war, as well as the seizure of property. *See* Richard Lee, *Treatise of Captures in War* 45–63 (2d ed. 1803) (tracing the evolution of the law concerning definition and treatment of captured enemies); Emmerich de Vattel, *The Law of Nations* 394 (Joseph Chitty ed., 1834) (1758) (explaining that persons or things "captured" by the enemy are usually freed as soon as they fall into the hands of soldiers belonging to their own nation); G.F. Martens, *An Essay on Privateers, Captures, and Particularly on Recaptures* (1881) (Thomas Hartwell

trans., 2004) (addressing the treatment by various nations of prisoners of war as part of the law of captures).

The Supreme Court also presumed this understanding of the Captures Clause in the early decision *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), in which Chief Justice Marshall considered whether by virtue of a declaration of war the President possessed authority to detain enemy aliens (both enemy civilians and enemy combatants) and to confiscate their property. After quoting the Captures Clause, the Court noted that Congress had enacted laws regulating both enemy aliens and their property in the War of 1812, and concluded that those laws should govern the actions of the Executive Branch in the conflict. *See id*. at 126 ("The act concerning alien enemies, which confers on the president very great discretionary powers respecting their persons, affords a strong implication that he did not possess those powers by virtue of the declaration of war."); *see id*. (citing an "act for the safe keeping and accommodation of prisoners of war"). Insofar as the early Supreme Court, relying on the Captures Clause, commented favorably on Congress's authority to regulate the treatment of prisoners of war—and, indeed, actually suggested that the exercise of such congressional authority counseled against locating the authority to detain enemy prisoners solely in the general war powers of the President—we have substantial doubts about the assertion that the Captures Clause grants no power to Congress with regard to the detention and treatment of enemy combatants.[2]

For all these reasons, the identified assertions in the five opinions excerpted above do not reflect the current views of OLC and should not be treated as authoritative. This Office previously has withdrawn two of those opinions in their entirety. Appropriate caution should be exercised before relying in other respects on the remaining three opinions.

---

[2] The survey of early historical examples in the Detainee Transfer Opinion similarly does not support that opinion's assertion that an "unbroken historical chain" recognizes "exclusive Presidential control over enemy soldiers." *Id*. at 19. To the contrary, that history very usefully demonstrates a number of examples (such as the statute cited in *Brown*) where Congress passed legislation addressing the circumstances of captured soldiers. Although many of those measures simply authorized presidential action, and were careful to preserve broad discretion for the President, they reflect an early understanding that Congress, as well as the President, has relevant authority in this area.

## II. Interpreting FISA and Its Applicability
## to Presidential Authority

A number of classified OLC opinions issued in 2001–2002 relied upon a doubtful interpretation of the Foreign Intelligence Surveillance Act ("FISA"). As the Department has previously acknowledged, these opinions reasoned that, unless Congress had made clear in FISA that it sought to restrict presidential authority to conduct warrantless surveillance activities in the national security area, FISA must be construed to avoid such a reading, and these opinions asserted that Congress had not included such a clear statement in FISA. *See* Letter for Dianne Feinstein & Sheldon Whitehouse, U.S. Senate, from Brian A. Benczkowski, Principal Deputy Assistant Attorney General, Office of Legislative Affairs (May 13, 2008). All but one of these opinions have been withdrawn or superseded by later opinions of this Office. The remaining opinion containing this questionable proposition is:

> 6. Memorandum for William J. Haynes II, General Counsel, Department of Defense, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: [Classified Matter]* at 13 (Feb. 8, 2002) ("Classified FISA Opinion").

The proposition paraphrased above interpreting FISA and its applicability to presidential authority does not reflect the current analysis of the Department of Justice and should not be relied upon or treated as authoritative for any purpose. The general rule of construction that statutes will not be interpreted to conflict with the President's constitutional authorities absent a clear statement that Congress intended to do so is unremarkable and fully consistent with longstanding precedents of this Office. *See, e.g.*, Memorandum for Alan Kreczko, Legal Adviser to the National Security Council, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 47 U.S.C section 502 to Certain Broadcast Activities* at 3 (Oct. 15, 1993) ("The President's authority in these areas is very broad indeed, in accordance with his paramount constitutional responsibilities for foreign relations and national security. Nothing in the text or context of [the statute] suggests that it was Congress's intent to circumscribe this authority. In the absence of a clear statement of such an intent, we do not believe that a statutory provision of this generality should be interpreted to restrict the President's] constitu-

tional powers" to conduct the Nation's foreign affairs and to protect the national security). The courts apply the same canon of statutory interpretation. *See, e.g.*, *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress has specifically provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."). However, the application of this canon of construction to conclude that FISA does not contain a clear statement that Congress intended the statute to apply to the President's exercise of his constitutional authority is problematic and questionable, given FISA's express references to the President's authority. The statements to this effect in earlier opinions of OLC were not supported by convincing reasoning.

As set forth in the Justice Department's white paper of January 19, 2006, addressing the legal basis for the surveillance activities of the National Security Agency publicly described by the President in December 2005, the Department's more recent analysis is different: Congress, through the Authorization for Use of Military Force of September 18, 2001, Pub. L. No. 107-40, 115 Stat. 224 ("AUMF"), confirmed and supplemented the President's Article II authority to conduct warrantless surveillance to prevent further catastrophic attacks on the United States, and such authority confirmed by the AUMF could reasonably be, and therefore had to be, read consistently with FISA, which explicitly contemplated that Congress could authorize electronic surveillance by a statute other than FISA. *See* U.S. Department of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006) ("White Paper"). As the January 2006 White Paper pointed out, "[i]n the specific context of the current armed conflict with al Qaeda and related terrorist organizations, Congress by statute [in the AUMF] had confirmed and supplemented the President's recognized authority under Article II of the Constitution to conduct such surveillance to prevent further catastrophic attacks on the homeland." *Id*. at 2. The White Paper further explained the particular relevance of the canon of constitutional avoidance to the NSA activities: "Even if there were ambiguity about whether FISA, read together with the AUMF, permits the President to authorize the NSA activities, the canon of constitutional avoidance requires reading these statutes to overcome any restrictions in

FISA and Title III, at least as they might otherwise apply to the congressionally authorized armed conflict with al Qaeda." *Id.* at 3.[3]

Accordingly, because the proposition highlighted above does not reflect the current views of this Office, appropriate caution should be exercised before relying in any respect on the Classified FISA Opinion as a precedent of OLC.

## III. Presidential Authority to Suspend Treaties

Two opinions of OLC from 2001 and 2002 asserted that the President, under our domestic law, has unconstrained discretion to suspend treaty obligations of the United States at any time and for any reason as an aspect of the "executive Power" vested in him by the Constitution:

7. Memorandum for John B. Bellinger III, Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* at 12, 13 (Nov. 15, 2001) ("ABM Treaty Suspension Opinion") ("The President's power to suspend treaties is wholly discretionary, and may be exercised whenever he determines that it is in the national interest to do so. While the President will ordinarily take international law into account when deciding whether to suspend a treaty in whole or in part, his constitutional authority to suspend a treaty provision does not hinge on whether such suspension is or is not consistent with international law." (footnote omitted); "The power unilaterally to suspend a treaty subsumes complete and partial suspension: both kinds of suspension authority are comprehended within the 'executive Power,' U.S. Const, art. II, § 1, cl. 1[.]").

---

[3] We recognize that the Supreme Court in Hamdan v. Rumsfeld refused to read the AUMF to authorize the President to convene military commissions in contravention of the Court's interpretation of the Uniform Code of Military Justice. 548 U.S. at 557–58. The Department's 2006 White Paper, however, was based on the view that FISA, which expressly contemplated that Congress may authorize warrantless surveillance in a separate statute, such as the AUMF, was more like the statute at issue in Hamdi, 18 U.S.C. § 4001(a), which prohibits detention of a U.S. citizen, "except pursuant to an act of Congress." See White Paper at 20–23.

8. Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* at 11–13 (Jan. 22, 2002) ("Application of Treaties Opinion") (reasoning that the President has "unrestricted discretion, as a matter of domestic law, in suspending treaties").

The highlighted assertions were based on generalizations from historical examples in which Presidents have acted in certain limited circumstances to terminate or suspend treaties. *See, e.g.*, ABM Treaty Suspension Opinion at 14–18.

We have previously concluded in a file memorandum that the reasoning supporting these assertions is unconvincing. *See* Memorandum for the Files from C. Kevin Marshall, Deputy Assistant Attorney General, and Bradley T. Smith, Attorney-Adviser, Office of Legal Counsel, *Re: Legal Issues Regarding Proposed Broadcasts into Cuba* at 2, 11–13 (May 23, 2007) ("Cuba Broadcasting File Memorandum"). We observed that Presidents have traditionally suspended treaties where authorized by Congress or where suspension was authorized by the terms of the treaty or under recognized principles of international law, such as where another party has materially breached the treaty or where there has been a fundamental change in circumstances. *See id*. at 6–13. We found the two opinions' treatment of this history to be unpersuasive, their analysis equating treaty termination with treaty suspension to be doubtful, and their consideration of the Take Care Clause to be insufficient. *See id*. at 11–13. For those reasons, in 2006 we advised the Legal Adviser to the National Security Council and the Deputy Counsel to the President not to rely on the two opinions identified above to the extent they suggested that the President has unlimited authority to suspend a treaty beyond the circumstances traditionally recognized. *Id*. at 13. We noted that the President, in fact, had not relied upon the broad assertions of authority to suspend treaties contained in the ABM Treaty Suspension Opinion and the Application of Treaties Opinion; the President decided not to suspend the Third Geneva Convention as to Afghanistan, and he did not suspend the ABM treaty (instead, the United States gave formal notice of withdrawal from the treaty pursuant to its terms). *Id*. In summarizing the advice given in

2006 concerning the reliability of the 2001 and 2002 opinions, our file memorandum emphasized that although we questioned the reasoning in these opinions, we had no occasion to make a determination about the extent of the President's authority to suspend treaties:

> The above critique is not meant to be a determination that under the Constitution the President lacks authority to suspend treaties absent authorization from Congress, the text, or background law. The White House did not directly ask that question [in 2006], and we did not purport to resolve it. There are arguments to be made based on the Vesting Clause and other provisions of Article II, as well as history. Other prior opinions have suggested that the President could have plenary authority to terminate treaties, and one can find scholars supporting such a view. The issue, however, is not nearly as simple or clear as the [ABM Treaty Suspension Opinion] and [the Application of Treaties Opinion] indicated, and we therefore are no longer willing to advise the President to act in reliance upon those memoranda's more sweeping claims.

*Id*. (citation omitted).

We adhere to the 2007 Cuba Broadcasting File Memorandum, and, accordingly, we confirm that the highlighted propositions from the ABM Treaty Suspension Opinion and the Application of Treaties Opinion do not reflect the current views of this Office and should not be treated as authoritative, and that appropriate caution should be exercised before relying upon these opinions in other respects.

## IV. "National Self-Defense" as a Justification for Warrantless Searches

A 2001 OLC opinion addressing the constitutionality of proposed FISA amendments asserted the view that judicial precedents approving the use of deadly force in self-defense or to protect others justified the conclusion that warrantless searches conducted to defend the Nation from attack would be consistent with the Fourth Amendment:

9. Memorandum for David S. Kris, Associate Deputy Attorney General, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Amending Foreign Intelligence Surveillance Act to Change the "Purpose"*

*Standard for Searches* at 8 (Sept. 25, 2001) ("FISA Amendments Opinion") (reasoning that because the Government's post-9/11 interest in "preventing terrorist attacks against American citizens and property within the continental United States" implicated the "right to self-defense . . . of the nation and of its citizens," and because the courts had recognized that "deadly force is reasonable under the Fourth Amendment if used in self-defense or to protect others," it was appropriate to conclude that "[i]f the government's heightened interest in self-defense justifies the use of deadly force, then it certainly would also justify warrantless searches").

We believe that this reasoning inappropriately conflates the Fourth Amendment analysis for government searches with that for the use of deadly force.

We do not doubt that the existence of a government interest in preventing catastrophic terrorist attacks is highly relevant in determining whether a particular search would be "reasonable" under the Fourth Amendment. Although warrants are often required in the criminal law context, the Supreme Court has recognized warrantless searches to be "reasonable" in a variety of situations involving "special needs" that go beyond the routine interest in law enforcement. *See, e.g.*, *Bd. of Educ. v. Earls*, 536 U.S. 822, 828 (2002). Foreign intelligence collection may fit squarely within the area of "special needs, beyond the normal need for law enforcement," particularly where it occurs in the midst of an ongoing armed conflict and for the purpose of preventing a future terrorist attack. *See* White Paper at 37. Accordingly, as explained at length in the Department's January 2006 White Paper, warrantless searches for such purposes may well be "reasonable" and consistent with the Fourth Amendment. *Id*. To the extent that the FISA Amendments Opinion advances that straightforward proposition, we have no disagreement.

However, the FISA Amendments Opinion's reliance on court decisions involving the use of deadly force suggests a "self-defense" rationale whereby the purpose behind a search would, standing alone, justify the search for purposes of the Fourth Amendment. The Supreme Court has recognized that the use of deadly force may be "reasonable" under the Fourth Amendment where the "officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or

to others." *Tennessee v. Garner*, 471 U.S. 1, 12 (1985); *see also Graham v. Connor*, 490 U.S. 386, 392 (1989). Under this rule, the circumstances in which deadly force may be employed are highly fact-dependent and require a showing that the officer believed that the suspect posed an imminent threat of harm. The FISA Amendments Opinion's assertion that, "[i]f the government's heightened interest in self-defense justifies the use of deadly force, then it certainly would also justify warrantless searches," does not adequately account for the fact-dependent nature of the Fourth Amendment's "reasonableness" review, and does not expressly recognize that the circumstantial factors relevant to the *Tennessee v. Garner* self-defense analysis are not necessarily the same as those that may determine the constitutional reasonableness of a particular search, both in its inception and in its scope.

Accordingly, the highlighted reasoning in the FISA Amendments Opinion does not reflect the current views of OLC.

*     *     *     *     *

For all the foregoing reasons, the propositions highlighted in the nine opinions identified above do not reflect the current views of the Office of Legal Counsel and should not be treated as authoritative for any purpose. A number of the opinions that contained these propositions have been withdrawn or superseded and do not constitute precedents of this Office; caution should be exercised before relying in other respects on the remaining opinions.

We have advised the Attorney General, the Counsel to the President, the Legal Adviser to the National Security Council, the Principal Deputy General Counsel of the Department of Defense, and appropriate offices within the Department of Justice of these conclusions.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*