NOT DESIGNATED FOR PUBLICATION

No. 114,274

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.S.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed April 8, 2016.
Affirmed.

*Rachel I. Hockenbarger*, of Topeka, for appellant natural father.

*Bethany C. Fields*, deputy county attorney, and *Barry R. Wilkerson*, county attorney, for appellee,
and *Lora Ingels*, of Manhattan, guardian ad litem.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*: R.S., the father of four children deemed to be children in need of
care, argues that insufficient evidence supports that finding and that the district court
violated his Fourth Amendment rights by ordering him to submit to drug testing at certain
court proceedings. Having reviewed the evidence, we affirm.

*Procedural background*

R.S. (Father), the natural father of C.S. (born in 2003), A.S. (born in 2005), A.S.
(born in 2008), and E.S. (born in 2010) (collectively the children), appeals the district
court's adjudication of the children as children in need of care (CINC). Father argues
clear and convincing evidence did not support the district court's findings that the
children were in need of care under K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11).

1

He also claims the district court's order that he submit to drug testing at certain court proceedings violated the Fourth Amendment's prohibition on unreasonable searches.

On April 29, 2015, the State filed a petition in the Riley County District Court alleging that the children were CINC. Specifically, the State asserted that the children (1) were without adequate parental care, control, or subsistence, a condition not due solely to their parents' or custodian's lack of financial means; (2) were without the care or control necessary for their physical, mental, or emotional health; (3) had been sexually abused or physically, mentally, or emotionally abused or neglected; and (4) had been residing in a residence with a sibling or another person under 18 years of age who had been sexually abused or physically, mentally, or emotionally abused or neglected. See K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11).

*The affidavit*

As the factual basis for the allegations, an affidavit from Riley County Police Officer Carla Swartz was attached to the petition and incorporated by reference. The affidavit set forth the following information:  On April 27, 2015, the children's maternal uncle, A.A., and maternal grandmother, C.B., visited the police department to express their concerns about the children, who lived in Topeka with Father and their mother (Mother). C.B. lived in Chapman. She stated that approximately 2 weeks before, she had received a call from one of the children asking her to pick up E.S., the youngest child, because there was no one home to take care of her. C.B. went to Topeka and brought E.S. and Mother to Chapman. One week later, Father called C.B. and asked her to come get the rest of the children because his house had been burglarized and he did not feel that the children were safe there. C.B. picked up the rest of the children and brought them to Chapman, while Mother stayed in Topeka. Since that time, the children had been living in Chapman with C.B. or in Riley with A.A. or their maternal aunt, A.A.B. During

2

this time, the children had reported incidents of fighting and drug use by the parents and an inability of the parents to care for the children.

C.B. and A.A. advised that the children were homeschooled by Mother prior to being enrolled in Topeka schools in January or February 2015. They reported that the children had often missed school, had not received vaccinations, and had not been to a doctor or dentist in years. C.S. had complained that two of his teeth had been hurting for a long time. None of the maternal relatives was given guardianship or power of attorney over the children to obtain medical care or to meet the children's educational needs. C.B. stated that Mother had recently attempted to commit suicide and was taken to Stormont Vail Hospital. While there, Mother was arrested for battering a nurse and a police officer, and the case was still pending. The maternal relatives all stated that they had received numerous erratic text messages from Father and Mother. Some of the messages stated that they could not take care of the children because they were being evicted from their apartment. According to C.B., Father stated that he was going to have the children placed in foster care because he was going to stay at the VA, while Mother said that she was trying to get placement in a shelter. In other messages, Father and Mother threated to call the police to have the relatives arrested for kidnapping if they did not return the children to them.

The affidavit further provided that Officer Swartz spoke with the children and D.B., the children's 15-year-old half-brother, who also lived with Father (D.B.'s stepfather) and Mother. D.B. reported that Father and Mother had regularly been using drugs over the past 2 months. D.B. advised that they fought and screamed at each other for extended periods of time, expressed signs of paranoia by constantly looking out the windows for the police, and did not take care of the children because they would sleep for several days straight. According to D.B., he took care of his siblings by putting them to bed, getting them to school, shopping for food, cooking, feeding the children meals, and protecting them when their parents were fighting. D.B. stated that Father had threatened

3

to kick him out of the house if he told anyone what was going on or if he did not clean the house, and he reported that Father had kicked Mother out of the house and she was sleeping outside on the ground. D.B. stated that he was unable to continue caring for all the children and felt they were not safe due to the parents' drug use. The children corroborated D.B.'s statements, and the older children advised that they did not want to return to their parents' home because they did not feel safe there.

*The drug testing of Father*

Based on the information Officer Swartz received, she placed the children into police protective custody. The children were subsequently placed in the temporary custody of the Kansas Department for Children and Families (DCF), and the court ordered that supervised parental visitation would be conditioned on negative random urine and breath tests. Father and Mother filed motions for rehearing on the temporary custody orders, alleging that they had not received notice of the temporary custody hearing. A hearing on these motions was held on May 13, 2015. After being advised that Father's behavior in the hallway outside the courtroom indicated that he may be under the influence of alcohol or drugs, the district court ordered both parents to submit to urine and breath tests. They complied before the hearing began. Mother did not test positive for any drugs, while Father tested positive for amphetamine, methamphetamine, hydrocodone, and tramadol. Father left after submitting to testing but later returned in the middle of the hearing, when Father and Mother both moved to withdraw their motions for rehearing. The district court granted the motions, and the prior orders remained in effect.

On June 4, 2015, Father filed a pro se motion to suppress evidence, alleging that the urinalysis (UA) results from May 13, 2015, had been obtained under duress and in violation of his rights under the Fourth Amendment to the United States Constitution. After hearing argument on the matter, the district court denied the motion. At that time,

4

the court also ordered Father to submit to a UA and a breath test, but Father refused. The court considered Father's refusal to be a positive test.

*The testimony*

An adjudication hearing was held on July 10, 2015. At the hearing, the district court heard testimony from several witnesses, including the relevant testimony detailed below.

*Officer Carla Swartz*

Officer Swartz was the only witness to testify for the State. She testified as to her interactions with C.B., A.A., D.B., and the children, as detailed in her affidavit. According to Officer Swartz, D.B. stated that he had been homeschooled until January 2015, when he began attending school in Topeka. D.B. claimed that he was behind in school and had not been attending regularly because he often had to take care of his siblings. D.B. advised that he had not been to the doctor or dentist for a long time and that C.S. had complained that his teeth hurt and also had not been to the dentist in a long time. Officer Swartz testified that when she met with C.S., he confirmed that two of his teeth had hurt for a while and he had not been to the dentist in 3 years. C.S. also stated that he had recently started school and he was way behind the other children. Officer Swartz noted that the family members with whom the children were living did not have the legal ability to care for the children's medical needs or enroll them in school. Officer Swartz testified that, in addition to D.B's oral statements, D.B. had also provided a written statement to her that was consistent with the information he provided during his interview. This letter was admitted into evidence at the hearing without objection. The letter stated:

5

"I [D.B.] for the past month or two have had to take care of five children in [Father's] home. I had to buy meals and make them, while both parents were in house sleeping or fighting. Whenever they fought I took five children upstairs and had to protect them from both parents they were scared. I also had to pick two children up every day even when my dad was home sleeping. I was pulled out of school to watch kids while both parents were home sleeping. My mother told me she and dad had been doing meth and that I had to save the kids. My dad threatened me saying he would kick me out of the house or hit me if I talk[ed] to anyone. [A]nd I had to lock me and my brother[']s doors because my dad would come and peek out the windows. My father pawned a computer for drugs. My mother says she hang[s] out with meth heads. I do not feel safe with [Father] or [Mother]."

Officer Swartz testified that Mother had recently overdosed and was taken to the hospital in Topeka, where she battered an officer and a nurse. Officer Swartz stated that Mother had also been convicted of domestic battery against Father. C.B. told Officer Swartz that she had Mother's bond revoked after Mother told her that she was going to take the children to Colorado in order to avoid the court proceedings in Topeka. Officer Swartz stated that Father and Mother had told the maternal relatives that they were in the process of being evicted and indicated that they were going to come get the children and go to Colorado. Officer Swartz testified that she had attempted to contact Father and Mother, but they did not respond. Based on her training and experience, Officer Swartz felt that Father's and Mother's behavior was consistent with methamphetamine use. Officer Swartz stated that based on all the information she received, she placed the children into police protective custody because she believed they were children in need of care.

*Father*

Father testified that his family moved from Colorado to Topeka in September 2014. He stated that there had been multiple DCF investigations and attempts by family

6

members to take the children away from him. Father testified that Mother had a history of mental health issues and suicidal ideations but she had been doing well since about 2003. According to Father, Mother's mental health issues started again in November 2014. He stated that Mother attempted suicide and physically assaulted him, but she was never violent towards the children. Father stated that he tried not to argue with Mother in front of the children and he often had C.B. take them when Mother had psychological breakdowns. Mother had been in and out of the home from November 2014 to January 2015, and Father wanted to make sure it was safe for her to be around the children before he would let her back in the home. Father believed that Mother's family blamed him for her mental health issues because he would not have her committed to a hospital.

Father testified that he was working full-time for the VA and had been a full-time graduate student, but he had stopped going to school due to all the stress and chaos at home. Once Mother's mental health issues began, E.S. stayed with C.B. and Father enrolled the other children in the Topeka school district. He enrolled the first child beginning in January 2015 and the last child at the end of March 2015. Father testified that he was able to pay his bills, but there were times that the family struggled financially and he relied on C.B.'s assistance to help with Mother. Father admitted that D.B. helped with shopping and taking care of the children when Mother was in and out of the house, but he denied that D.B. was acting as their parent.

Father testified that he was attending counseling with the VA and through his church's addiction recovery program and he had previously been in treatment for heroin and other drug addiction. Father claimed that he had not used any illegal drugs since 2011 or 2012. Father denied that he was paranoid and claimed that he only looked out his windows to watch the neighbor's house, where he suspected Mother was around methamphetamine users. Father stated that he had never witnessed Mother using any type of controlled substance.

7

Father testified that he sent the children to live with C.B. in April 2015 after his house was burglarized because he did not feel the children were safe there. Father admitted that he did not contact the police about this burglary. Father stated that prior to this incident he had been looking for a different placement for the children and had been working with Safe Families in Topeka. Father testified that he did not give C.B. power of attorney to get the children medical care or to have their educational needs met, but he asserted that there was no reason do so because he never intended for them to stay with her long term. Father stated that he had medical and dental insurance for the children and the two youngest children had been to an eye doctor in March 2015. Father stated that Mother was in charge of making sure that the children's medical and dental needs were being met and he did not know when they had last been to the dentist. Father claimed that C.S. had missed a dentist appointment because he was living with C.B.

Father testified that when this case started he had a clean home, was employed, and the children were enrolled in school. Thereafter, Father lived at a home for homeless veterans for a month and then moved in with his mother. Father stated that he and Mother intended to move to Colorado. Father asserted that he was willing and able to take care of the children and had wanted them back home since the start of the case. To that end, Father claimed that he contacted C.B. every day about returning the children to him and he had also contacted the police about getting the children back. Father admitted that neither he nor Mother ever went to get the children from C.B.

*T.A.*

T.A., Father's stepson, testified that he had lived with Father and Mother in early 2015. T.A. testified that Father and Mother sometimes argued in front of the children but D.B. would take the younger children upstairs when the fighting got bad. T.A. moved to Colorado in March and stated that he never witnessed anything that caused him to be concerned for the safety of the children. T.A. stated that he and D.B. helped with the

8

chores but were not responsible for the cooking or grocery shopping. After T.A. moved out, D.B. told him that Mother and Father were fighting but never expressed concerns that the children were in any danger. D.B. also told him that Mother said Father was using methamphetamine. T.A. claimed that he never saw any drug use while he was living at home and never had any concern that Father was using drugs. But T.A. admitted that he did not know what had gone on at home since he left and that he was aware D.B. had been pulled out of school for a week in order to help with the children.

*D.B.*

D.B. briefly testified that he did not personally witness Father or Mother use methamphetamine; however, Father and Mother had pulled him out of school to watch the children, and he did not want to go back to Topeka to live with Father and Mother.

*The district court's ruling*

After hearing the testimony outlined above, the district court adjudicated the children to be CINC pursuant to K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11). Father timely appealed from this ruling. Thereafter, a disposition hearing was held on August 5, 2015, where the district court ruled that the previous findings and orders were to remain in effect and adopted a case plan goal of reintegration. A permanency hearing was scheduled for April 29, 2016.

*Our review*

Father raises two arguments on appeal. First, he argues clear and convincing evidence did not support the district court's findings that the children were in need of care under K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11). Second, he claims the district

9

court's order that he submit to drug testing at certain court proceedings violated the Fourth Amendment's prohibition on unreasonable searches.

I. DID THE DISTRICT COURT PROPERLY ADJUDICATE THE CHILDREN TO BE IN NEED OF CARE?

The burden is on the State to prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2015 Supp. 38-2250. Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). The Kansas Supreme Court has clarified our role:

> "[W]hen an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence that the child was a CINC." 286 Kan. at 705.

In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. Moreover, to the extent our review requires us to interpret the provisions of K.S.A. 2015 Supp. 38-2202(d), this is a question of law over which we have unlimited review. See *Jeanes v. Bank of America*, 296 Kan. 870, 873, 295 P.3d 1045 (2013).

Finally, the legislature has made it clear that the Revised Kansas Code for Care of Children shall be liberally construed to carry out the policies of the State. K.S.A. 2015 Supp. 38-2201(b). Those policies are, in part, to consider the safety and welfare of children to be paramount in all proceedings under the Revised Code; to make the ongoing physical, mental, and emotional needs of children decisive considerations in all

10

proceedings under the Revised Code; and to provide for the protection of children who have been subject to physical, mental, or emotional abuse or neglect. See K.S.A. 2015 Supp. 38-2201(b)(1), (3), (7).

In the present case, the district court determined that the children fit the statutory definition of CINC because they were:

"(1) . . . without adequate parental care, control or subsistence and the condition is not solely due to the lack of financial means of the child[ren]'s parents or other custodian;

"(2) . . . without the care or control necessary for the child[ren]'s physical, mental or emotional health;

"(3) . . . physically, mentally or emotionally abused or neglected; and

. . . .

"(11) . . . residing in the same residence with a sibling or another person under 18 years of age, who has been physically, mentally or emotionally abused or neglected." K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11).

As support for his argument that the evidence was insufficient to support the district court's ruling, Father contends that (1) the district court infringed upon his fundamental right to raise his children by failing to engage in a due process balancing test to determine whether his interest outweighed any interest claimed by the State; (2) law enforcement lacked the authority to place the children into protective custody; and (3) the district court improperly relied on hearsay evidence in making its ruling.

*A. Due process balancing test*

Father argues that before the district court could enter its CINC ruling, it was required to engage in a due process balancing test as set forth in *In re L.B.*, 42 Kan. App. 2d 837, 840-42, 217 P.3d 1004 (2009) (citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 [1976]; *In re J.D.C.*, 284 Kan. 155, 159 P.3d 974 [2006]), *rev. denied* 289 Kan. 1278 (2010).

The courts have held that a parent's right to decide about the care, custody, and control of his or her children is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Sheppard v. Sheppard*, 230 Kan. 146, 152, 630 P.2d 1121 (1981), *cert. denied* 455 U.S. 919 (1982). This right, however, is not absolute because the welfare of children is also a matter of State concern. 230 Kan. at 149. Before a court can deprive a parent of his or her right to custody, care, and control of his or her children, the parent is entitled to due process of law. 230 Kan. at 152-54. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews*, 424 U.S. at 333; *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 409, 49 P.3d 1274, *cert. denied* 537 U.S. 1088 (2002). The Kansas Supreme Court has described the full context necessary for a proper due process analysis of whether a fundamental liberty interest has been compromised. See *In re J.D.C.*, 284 Kan. at 166 ("A due process violation exists only when a claimant is able to establish that he or she was denied a specific procedural protection to which he or she was entitled.").

Father suggests that his due process rights were violated at the adjudication hearing when he was not permitted to confront the witnesses against him because the State's evidence regarding his alleged drug use, the children's exposure to violence, and the neglect of the children's education and medical care consisted entirely of hearsay testimony presented by Officer Swartz. But this hearsay argument is raised for the first

12

time in the Father's reply brief. An argument asserted for the first time in a reply brief does not conform to Supreme Court Rule 6.05 (2015 Kan. Ct. R. Annot. 49) and will be disregarded. See *State v. McCullough*, 293 Kan. 970, Syl. ¶ 10, 270 P.3d 1142 (2012); *Ortiz v. Biscanin,* 34 Kan. App. 2d 445, 467, 122 P.3d 365 (2004).

Further, Father did not object at the hearing that Officer Swartz's testimony was hearsay. Under K.S.A. 60-404, "a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review." *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). Father's complaints regarding the admission of statements made by adult family members are not properly preserved because Father's only hearsay objections at the adjudication hearing related to statements made by D.B.

But even if we were to reach the merits of this issue, Father would not prevail. Assuming that the balancing test he desires would leads to the conclusion that the Due Process Clause required an opportunity for confrontation of the witnesses in this case, we then must decide whether the opportunity offered to Father was sufficient. We find that it was.

Father's argument misinterprets the definition of hearsay. K.S.A. 2015 Supp. 60-460 provides that unless an exceptions applies, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible." Officer Swartz' testimony did not constitute hearsay because it was not offered to prove the truth of these allegations; rather, the testimony was offered to show that these allegations had been made and to explain the reasons for the officer's belief that the children were in need of care.

Father did timely object at the adjudication hearing that certain statements made by D.B. were hearsay. But D.B. was present at that hearing, and K.S.A. 2015 Supp. 60-

13

460(a) permits "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by a declarant while testifying as a witness." Although Father, not the State, called D.B. to testify at the hearing, the statute does not require D.B. to have testified on direct examination in order to be "present" or "available for cross-examination" about his hearsay statements. See *In re J.D.C.*, 284 Kan. at 163. Father's counsel thus had the opportunity to fully explore all of D.B.'s alleged hearsay statements on direct examination. As a result, Father has failed to establish that he was denied a specific procedural protection to which he was entitled.

   *B. Authority to place children in protective custody*

   Father argues that law enforcement had no legal authority to place the children into protective custody because the evidence presented at the adjudication hearing established that the children's needs were being met at the time the CINC petition was filed.

   K.S.A. 2015 Supp. 38-2231(b)(1) provides that an officer shall take a child under 18 into protective custody when the officer "[r]easonably believes the child will be harmed if not immediately removed from the place or residence where the child has been found." K.S.A. 2015 Supp. 38-2232(a)(1) further provides: "To the extent possible, when any law enforcement officer takes into custody a child under the age of 18 years without a court order, the child shall forthwith be delivered to the custody of the child's parent or other custodian unless there are reasonable grounds to believe that such action would not be in the best interests of the child."

   Father contends there was no evidence in the record to show that Officer Swartz reasonably believed the children would be harmed if they were not immediately removed from C.B.'s home or that any emergency otherwise warranted their removal. Father

14

claims the evidence instead showed that the parents had voluntarily placed the children with C.B. and nothing indicated that she was not taking care of them at the time they were placed into protective custody. Therefore, Father asserts that, at the time the petition was filed, the children were in a safe and stable environment where their needs were being met and suggests that any allegations regarding his home were not relevant because the children were no longer residing there. Father further alleges that Officer Swartz made no attempt to investigate any of the allegations or otherwise determine whether a parent was available to take the children.

Father's arguments are without merit. Officer Swartz spoke with the adult maternal relatives, 15-year-old D.B., and the children, who all provided consistent allegations of drug use, neglect, and lack of supervision at Father's home. The children expressed concern for their safety there. Officer Swartz testified that she had unsuccessfully attempted to contact Father and Mother regarding the allegations. Contrary to Father's assertion, the allegations about Father's home were relevant to Officer Swartz' determination that it would not be in the children's best interests to be returned to their parents because it would expose them to an unstable home environment once again. Moreover, even though the children were residing either with C.B. or the other maternal relatives at the time the petition was filed, these relatives were unable to provide the children with their immediate medical or educational needs. Officer Swartz testified that she took all this information into consideration prior to placing the children into protective custody. Given this information, it was reasonable for Officer Swartz to believe that the children needed to be taken into protective custody and it would not be in the children's best interests to return to their parents. See K.S.A. 2015 Supp. 38-2231(b)(1); K.S.A. 2015 Supp. 38-2232(a)(1).

## C. *Hearsay evidence*

Finally, Father alleges the evidence was insufficient to support the district court's CINC determination because the State's evidence consisted entirely of Officer Swartz' hearsay testimony. Father contends the district court's ruling was contrary to his testimony, which contradicted the allegations made in the CINC petition.

We have previously addressed and rejected Father's claims that Officer Swartz' testimony was hearsay. Also, D.B. testified at the hearing, and Father's counsel had ample opportunity during direct examination to question him about any of his previous statements. Additionally, D.B.'s letter, which contained many of same allegations as the oral statements he provided to Officer Swartz, was admitted into evidence without objection.

The remainder of Father's argument is essentially an invitation to reweigh the evidence, which we cannot do. See *In re B.D.-Y.*, 286 Kan. at 705. Rather, this court must determine whether there was clear and convincing evidence to support the district court's finding that the children fit the statutory definition of CINC. See K.S.A. 2015 Supp. 38-2202(d)(1), (2), (3), and (11). The State presented evidence that the children were sent to live with maternal relatives after several chaotic incidents occurred at Father's home in Topeka, where there were allegations of drug use, neglect, and lack of supervision. The children did not feel safe returning home, and the maternal relatives with whom the children were living could not provide for the children's medical or educational needs. Viewing the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable that the children were in need of care. As a result, we find clear and convincing evidence supports the district court's CINC adjudication.

II. Did the District Court Violate Father's constitutional Rights by Ordering him to Submit to drug Testing?

Father next contends the district court violated his Fourth Amendment right against unreasonable searches by requiring him to submit to drug testing on certain occasions. Father also claims the court erred in relying on these test results in making its CINC ruling.

The parties recognize that the district court's drug testing order is subject to Fourth Amendment protection. See *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) ("[S]tate-compelled collection and testing of urine constitutes a 'search' subject to the demands of the Fourth Amendment.") The Fourth Amendment's prohibition on unreasonable searches has been defined to mean that a warrantless search, such as those ordered by the district court in this case, is presumed to violate the Fourth Amendment unless a recognized exception to the warrant requirement applies. *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

The parties suggest that the applicable exception here is the special needs exception, which recognizes there may be circumstances that arise outside the law-enforcement arena wherein a governmental interest creates a special need that makes the requirement of obtaining a warrant based on probable cause impractical. See *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002); *State v. Martinez*, 276 Kan. 527, 534, 78 P.3d 769 (2003). The legality of a search in special needs cases is determined by a careful balancing of governmental and private interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context. Factors include the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the government's interest. Gardner, *Paradigm Shifts in Search and suppression Law*, 79 J.K.B.A. 22, 26 (April 2010).

But the special needs exception does not apply in this case because the district court's order that Father submit to a drug test was based on its individualized suspicion that Father might have been using drugs, given his behavior at the May 13, 2015, court proceeding. In contrast, special needs cases involve a "lack of individualized suspicion of wrongdoing, and [a] concomitant lack of individualized stigma based on such suspicion." See *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1213 (10th Cir. 2003), *cert. denied* 540 U.S. 1179 (2004). The special needs doctrine does not apply to drug tests based upon individual suspicion rather than on a random or uniform selection process; instead, reasonable suspicion must support the search. *Benavidez v. City of Albuquerque*, 101 F.3d 620, 623-24 (10th Cir. 1996).

The specific issue raised by Father does not involve a special needs random or uniform selection process. Compare *State, ex rel. Secretary of S.R.S. v. Yarmer*, No. 102,885, 2010 WL 3564748, at * 3-4. (Kan. App. 2010) (unpublished opinion) (applying special needs test where the district court also ordered that a grandfather be subject to ongoing random drug testing by court services staff for purposes of visitation). Although the district court's temporary custody orders required that supervised parental visitation be conditioned on negative random drug tests, Father does not challenge those orders. Instead, Father argues only that the court's orders to submit to testing at certain court proceedings violated his Fourth Amendment rights. The record reflects that the district court ordered Father to submit to drug testing on May 13, 2015, after being advised that Father's behavior in the hallway outside the courtroom indicated that he may be under the influence of alcohol or drugs. The results showed that Father tested positive for methamphetamine and amphetamine. At a subsequent hearing on June 11, 2015, Father denied those positive results on grounds that the tests were preliminary and had not been tested in a laboratory. Accordingly, the district court asked Father to submit to drug testing at that time in order to have the test results formally evaluated. When Father refused, the court considered it a positive result.

18

The district court's orders that Father submit to drug testing on these occasions were based on an individualized suspicion of drug use. Thus, our inquiry is limited to whether the court had reasonable suspicion to order the drug testing. See *Benavidez*, 101 F.3d at 624. But Father does not address this issue in his brief, so we deem it abandoned. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (issue not briefed by appellant is deemed waived and abandoned). Additionally, the record is insufficient to permit us to make any findings with respect to whether the court did, in fact, have reasonable suspicion to order the drug testing, as we have no specific facts regarding what information the district court had before ordering Father's drug test or whether that information was reliable. See *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) (reasonable suspicion depends both upon the content of information possessed and its degree of reliability). If the information possessed by the district court when it ordered the test would create a reasonable suspicion that Father used, possessed, or was impaired by illegal drugs at the hearing, then the resulting drug test did not violate his Fourth Amendment rights. Father has the burden to designate a record that affirmatively shows he is entitled to relief. Without such a record, we presume the district court's action was proper. See *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013).

To the extent that Father challenges the district court's reliance on the positive drug tests in making its CINC ruling, the clear and convincing evidence detailed above demonstrates that the children were in need of care, even without consideration of Father's positive drug tests.

Affirmed.

19